## In re PIPER AIRCRAFT CORPORATION, Debtor.

### Bankruptcy No. 91–31884–BKC–RAM.

United States Bankruptcy Court, S.D. Florida.

Jan. 14, 1994.

Paul S. Singerman, Stroock, Stroock & Lavan, Miami, FL, for debtor.

Howard Berlin, Kluger, Peretz & Berlin, P.A., Miami, FL, for Official Unsecured Creditors' Committee.

Paul K. Ferdinands, King & Spalding, Atlanta, GA, for David G. Epstein, Legal Representative.

James E. Millstein, Cleary, Gottlieb, Steen & Hamilton, New York City, and Alan S. Fine, Miami, FL, for 2I, Inc.

Francis L. Carter, Coll, Davidson, Carter, Smith, Salter & Barkett, P.A., Miami, FL, for amicus 541474—Alberta, Ltd.

Oscar R. Cantu, Weil, Gotshal & Manges, Miami, FL, for Pilatus Aircraft, Ltd.

## MEMORANDUM OPINION

ROBERT A. MARK, Bankruptcy Judge.

Piper Aircraft Corporation has been designing, manufacturing and selling general aviation aircraft and associated spare parts

since 1937. Approximately 50,000 to 60,000 aircraft are still operational in the United States. Piper is attempting to reorganize under Chapter 11 of the Bankruptcy Code. Following confirmation of a plan, some of these planes will crash. People will be killed or injured. Others will suffer property damage. Some of the crashes may be caused in whole or in part by design or construction defects in the planes or in their parts. The Court must determine whether these presently unknown persons who will suffer personal injury or property damage in the future have "claims" in this bankruptcy case.

The specific issue before the Court is framed by an objection by the Official Committee of Unsecured Creditors to the claim filed by a court-appointed legal representative on behalf of this broad class of potential future claimants. The Court concludes that these future claimants do not have "claims" as defined by § 101(5) of the Bankruptcy Code.

### BACKGROUND FACTS AND PROCEDURAL HISTORY

Piper Aircraft Corporation ("Piper" or "Debtor") manufactures and distributes general aviation aircraft and spare parts throughout the United States and abroad. It began its manufacturing activities in 1937 and since that time has produced approximately 135,000 aircraft, of which approximately 50,000 to 60,000 are still operational in the United States. Over the years, Piper has been a defendant in several lawsuits based on its manufacture, design, sale, distribution and support of aircraft and parts. Although it has never acknowledged that its products are harmful or defective, Piper has suffered from the economic drain of escalating litigation costs in connection with defending these product liability claims. In large part because of this financial burden, on July

1, 1991, Piper filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

With 50,000 to 60,000 Piper aircraft still in operation, accidents involving these aircraft undoubtedly will occur. Thus, additional though presently unidentifiable individuals will have similar product liability, property damage, or other claims as a result of incidents occurring after confirmation of the Debtor's Chapter 11 plan of reorganization, but arising out of or relating to aircraft or parts manufactured, sold, designed, or distributed by the Debtor prior to confirmation.

The Debtor's anticipated plan of reorganization contemplates finding a purchaser of substantially all of the Debtor's assets or obtaining investments from outside sources with the proceeds of such transactions serving to fund distributions to creditors. On April 8, 1993, the Debtor and Pilatus Aircraft Limited ("Pilatus") signed a letter of intent ("Letter of Intent") pursuant to which the Debtor agreed to sell to Pilatus, and Pilatus agreed to purchase from the Debtor, substantially all of the Debtor's assets. The Letter of Intent required the Debtor to seek the appointment of a legal representative (the "Legal Representative") for future claimants to represent their interests in arranging a set-aside of monies generated by the sale to pay off future product liability claims. On May 19, 1993, the Court entered an order authorizing the appointment of David G. Epstein as Legal Representative of the "Future Claimants."[1] However, the Court specifically excluded from the appointment order any finding on whether the Future Claimants hold claims against the Debtor under § 101(5) of the Bankruptcy Code.

On July 12, 1993, the Legal Representative filed a proof of claim on behalf of the Future Claimants (the "Claim"). In the Claim, the Legal Representative asserts that the Debtor is indebted to the Future Claimants in the

---

1. The May 19 Order specifically defines "Future Claimants" to include:

All persons, whether known or unknown, born or unborn, who may, after the date of confirmation of Piper's chapter 11 plan of reorganization, assert a claim or claims for personal injury, property damage, wrongful death, damages, contribution and/or indemnification, based in whole or in part upon events occurring or arising after the Confirmation Date, including claims based on the law of product liability, against Piper or its successor arising out of or relating to aircraft or parts manufactured and sold, designed, distributed or supported by Piper prior to the Confirmation Date.

approximate amount of $100,000,000. The Claim purports to be based on statistical assumptions regarding the number of people who are likely to suffer personal injury or property damage after the confirmation of a reorganization plan, which is caused by Debtor's pre-confirmation manufacture, sale, design, distribution or support of aircraft and spare parts.

In conjunction with the Claim, the Legal Representative filed a motion requesting estimation of the Claim for voting purposes.[2] At the July 26, 1993 preliminary hearing on this motion, the Debtor, the Official Committee of Unsecured Creditors (the "Committee") and the Legal Representative urged the Court to determine whether the Future Claimants hold "claims" as defined in § 101(5) of the Bankruptcy Code before conducting an evidentiary hearing on the estimation motion. The Court agreed and set a briefing and hearing schedule, with the issue to be framed by a formal objection to the Claim. In turn, on July 28, 1993, the Committee filed an Objection to the Legal Representative's Claim.

The Legal Representative and Committee submitted memoranda on the objection, as did three potential purchasers of Piper's assets: Pilatus; 2I, Inc.; and Alberta, Limited. A hearing on the Objection to Claim was held on September 2, 1993. At the hearing, the Debtor joined the Committee in objecting to the Claim.[3] Various issues arose at the hearing, including whether or not the claims could be estimated and provided for in a plan and whether or not the claims, if they existed, were dischargeable. These issues are relevant to but distinct from the narrow and only issue the Court decides here: whether the Future Claimants hold "claims" as defined in § 101(5) of the Bankruptcy Code.

On September 10, 1993, the Court announced its ruling that the Future Claimants do not hold claims within the meaning of § 101(5). Detailed findings and conclusions pursuant to Fed.R.Bankr.P. 7052 were stated on the record. The Court advised that its written order disallowing the Claim, together with a Memorandum Opinion, would be entered subsequently.

Concerned that further delay in entering its Order on the Claim could impact the Legal Representative's efforts to seek prompt appellate review of its decision, on December 6, 1993 the Court entered its Order Sustaining the Committee's Objection to Claim and Disallowing Legal Representative's Proof of Claim. The December 6th Order also denied the Legal Representative's September 16, 1993 Motion for Reconsideration.[4]

This Memorandum Opinion supersedes the findings and conclusions entered on the record on September 10, 1993 and constitutes the findings and conclusions of the Court supporting its December 6, 1993 Order disallowing the Claim.

## DISCUSSION

### A. Statute And Legislative History

The Bankruptcy Code defines claim as follows:

(5) "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is re-

---

2. The Motion for Estimation of the Claims of the Piper Future Claimants for Voting Purposes was filed by the Legal Representative pursuant to Federal Rules of Bankruptcy Procedure 3018(a) and 9014.

3. When the Debtor sought appointment of the Legal Representative, it believed that a plan of reorganization based upon a sale of assets would have to make provision for the interests of Future Claimants, whether or not they had "claims." The Debtor and the Committee now believe that

providing for Future Claimants is unnecessary to attract viable purchase offers and legally impermissible if, as the Legal Representative argues, the Future Claimants can be treated under a plan only if they have "claims."

4. On December 9, 1993, the Legal Representative filed a Motion for Stay Pending Appeal. The motion for stay was argued and denied on December 16, 1993.

duced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured;

11 U.S.C. § 101(5). When Congress promulgated § 101(5), it intended to define "claim" more broadly than the term was defined under prior bankruptcy law.

Under the former Bankruptcy Act of 1898, a corporation could reorganize under Chapter X or Chapter XI.[5] Chapter XI defined claim very narrowly. Under Chapter XI, a claim had to be both "proved" and "allowed." Contingent obligations were theoretically "provable" under § 63 of the Bankruptcy Act. However, a contingent or unliquidated claim would not be "allowed" under § 57(d) of the Bankruptcy Act unless the claim could be estimated or liquidated. If the court believed a claim was not susceptible to liquidation or estimation, or that such liquidation or estimation would unduly delay the administration of the bankrupt's estate, the claim would be disallowed, and in turn be deemed unprovable under § 63(d) of the Act. Disallowed or unprovable claims were not subject to discharge.

As a result of this narrow definition, Chapter XI of the Bankruptcy Act prevented a debtor from treating under its plan certain contingent claims that were not "provable," including contingent tort claims. Thus, the Act allowed such claims to be asserted against the reorganized debtor and caused two potential results which contravened established bankruptcy policy: first, it allowed similarly situated creditors to be treated differently; and second, it often led to the failure of the reorganization process. *See generally, In re Pettibone Corp.,* 90 B.R. 918, 923–24 (Bankr.N.D.Ill.1988); *In re Edge,* 60 B.R. 690, 694 (Bankr.M.D.Tenn.1986); *In re Johns–Manville Corp.,* 57 B.R. 680, 686–87 (Bankr.S.D.N.Y.1986) for a discussion of the Bankruptcy Act's claim provisions and their effect.

In enacting the current Bankruptcy Code, Congress intentionally eliminated the "provability" requirement to broaden the range of claims that could be dealt with in bankruptcy and thereby avoid the inequities occurring under the Bankruptcy Act. The legislative history of § 101(5) reflects the intent of Congress in revising the definition of "claim," providing:

> By this broadest possible definition, and by the use of the term throughout title 11, especially in subchapter I of Chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the Bankruptcy Court.[6]

Based upon the statutory language and legislative history, virtually all courts agree that the definition of claim is expansive. *See, e.g., In re Robinson,* 776 F.2d 30 (2d Cir. 1985), *rev'd on other grounds,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), and cases cited therein. The question is, how far can the concept of "claim" be expanded? In referring to the legislative history, one court has observed, "That language surely points us in a direction, but provides little indication of how far we should travel," *In re Chateaugay Corp.,* 944 F.2d 997, 1003 (2d Cir.1991).

Pilatus and the Legal Representative argue that any right to payment arising out of the prepetition conduct of the Debtor, no matter how remote, should be deemed a claim and provided for in this case. Specifically, they argue that because Piper aircraft and parts manufactured, designed, sold or distributed prepetition will be involved in post-confirmation accidents causing injury, death and property damage, those individuals who suffer damages, although not yet identifiable, hold claims cognizable in this bankruptcy case. The Committee and the Debtor argue that while Congress intended to expand the definition of claim, the definition is

---

5. While Chapter X defined claim broadly, most corporations elected to file under Chapter XI to avoid a clause in Chapter X that provided for the automatic removal of management and the appointment of a Trustee upon the filing of a petition.

6. H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6266; *see also,* S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08.

not so broad as to include unidentified, and presently unidentifiable, individuals with no discernible prepetition relationship to Piper. For the reasons set forth below, the Court agrees with the Committee and the Debtor.

### B. Accrued State Law Claim Theory

■ The issue before the Court is defining the extent to which a "contingent," "unmatured," and "unliquidated" potential right to payment is a claim under § 101(5). Several theories have emerged in the relevant case law. Under the most narrow interpretation, there is no claim for bankruptcy purposes until a claim has accrued under state law. Most notable among cases adopting this approach is the Third Circuit's decision in *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). In *Frenville*, the court held that an indemnification claim which did not arise under state law until after the petition date was not a claim under § 101(5).

The problem with the *Frenville* decision and its progeny is that exclusive reliance on the accrual of a state law cause of action ignores the intent of Congress to define claim broadly in bankruptcy cases. State or non-bankruptcy law does not and should not override the bankruptcy policies of equitable distribution to creditors and a fresh start to the debtor. Defining the right to payment under § 101(5) by tying it to state law is inappropriate and the Court thus rejects the accrued state law claim theory, as have most courts that have considered it in the context of both mass tort cases and indemnification cases. *See In re A.H. Robins Co.*, 63 B.R. 986 (Bankr.E.D.Va.1986), *aff'd sub nom. Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986); *In re Johns–Manville Corp.*, 57 B.R. 680 (Bankr.S.D.N.Y.1986).

### C. Conduct Test Theory

Recognizing the shortcomings of the standard espoused in *Frenville*, several courts, including those addressing mass tort issues, devised a theory commonly referred to as the "Conduct Test." Under this test, a right to payment arises when the conduct giving rise to the alleged liability occurred. The leading Circuit Court of Appeals case describing and adopting the Conduct Test is *Grady v. A.H. Robins Co. (In re A.H. Robins Co.)*, 839 F.2d 198 (4th Cir.1988). In *A.H. Robins*, the claimant, Grady, was inserted with a Dalkon Shield contraceptive intra-uterine device (IUD) a number of years prior to the petition date. After the petition was filed, Grady manifested injuries related to the Dalkon Shield. Relying on California's "discovery rule" [7] statute of limitations provision, Grady argued that she was not stayed from bringing suit against the debtor because her claim arose postpetition.

The *A.H. Robins* court disagreed. Applying the Conduct Test, the Fourth Circuit held that Grady's claim was a prepetition contingent claim, since all of the acts constituting the tort other than the manifestation of injury had occurred prior to the petition date. 839 F.2d at 201. The court stated that Grady's claim was undoubtedly contingent as that term is defined in Black's Law Dictionary, and continued:

> [The claim] depends upon a future uncertain event, that event being the manifestation of injury from use of the Dalkon Shield. We do not believe that there must be a right to the immediate payment of money in the case of a tort or allied breach of warranty or like claim, as present here, when the acts constituting the tort or breach of warranty have occurred prior to the filing of the petition ...

*Id.* at 202. Using this analysis, the court held that Grady had a claim that arose before the commencement of the case.

Essentially the same test was applied in the asbestos case of *In re Waterman S.S. Corp.*, 141 B.R. 552 (Bankr.S.D.N.Y.1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y.1993). In *Waterman*, former em-

---

7. Under California law, actions based on progressively developing or continuing wrongs where the nature, extent or permanence of the harm are difficult to discover, do not accrue until the injured party knows or should have known of the cause of injury. *In re A.H. Robins Co.*, 63 B.R. at 989.

ployees of the debtor sought a declaratory judgment holding that their asbestosis claims, which were manifested post-confirmation, were not discharged by the confirmation order. In reaching his decision, Bankruptcy Judge Conrad bifurcated the analysis into two issues: first, whether the individuals held claims, and second, if they did hold claims, whether these claims were dischargeable.

In answering the first question, Judge Conrad followed the lead of the Johns–Manville asbestosis cases and reasoned that, in determining whether or not a claim exists, "the focus should be on the time when the acts giving rise to the alleged liability were performed," *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986). Since the asbestos was manufactured prepetition, and since the individuals suffering injuries were exposed prepetition, the former employees held "claims" under § 101(5). However, because the debtor failed to include this known class of creditors in its schedules and failed to provide adequate notice to this known class, Judge Conrad held that the claimants did not have notice sufficient to meet due process requirements for discharging their claims.[8]

At least one case has used a similar application of the Conduct Test outside the mass tort context. In *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986), the debtor was a dentist. After the debtor filed his Chapter 7 petition, a former patient sought a declaration that a "claim" based on negligent treatment received prior to the debtor's filing, but discovered afterwards, was a postpetition claim and thus not subject to the § 362 automatic stay. The court, applying a broad interpretation of claim as guided by the legislative history, concluded that the claim arose at the time of the debtor's prepetition misconduct and thus was subject to the automatic stay. *Id.* at 705. As in *Waterman* and *A.H. Robins*, the claimant had already been exposed to or had contact with the cause of injury (in *Edge*, the dentist's negligent treatment; in *Waterman* and *A.H. Robins*, known defective and dangerous products), but simply had not manifested injury as of the commencement of the case.

■ The Legal Representative urges a similar application of the Conduct Test in this case, with the relevant conduct being Piper's prepetition manufacture, design, sale and distribution of allegedly defective aircraft. However, unlike the asbestos and Dalkon Shield cases, the Legal Representative cannot pinpoint which aircraft or parts are defective or, more significantly, who will be exposed to the defective product in the future. In effect, under the Conduct Test, everyone in the world would hold a claim against Piper simply by virtue of their potential future exposure to any plane in the existing fleet. The conduct of Piper purporting to support the existence of prepetition "claims" is readily distinguishable from the conduct of the asbestos and Dalkon Shield manufacturers.[9] Thus, the Court rejects application of a Conduct Test that would give rise to "claims" simply because the design and manufacture of products occurred prepetition.

### D. Prepetition Relationship Theory

Recognizing that the Conduct Test may define a § 101(5) claim too broadly in some situations, several courts have recognized

8. On appeal, the District Court found that known potential claimants were entitled to actual personal notice; that potential claimants who could not be personally identified were entitled to reasonable notice by publication; and that potential future claims of individuals who had not manifested any detectable signs of disease when notice of the bar date was given were not discharged in the bankruptcy case. *Waterman*, 157 B.R. at 222 (S.D.N.Y.1993).

9. There is also no "great wrong" to be redressed in this case which mandates that present provisions be made for potential future claimants. In the asbestos and Dalkon Shield cases, manufac-

turers had produced and distributed products known to be harmful from well-documented and overwhelmingly accepted scientific evidence, and a defined group of individuals were exposed to these harmful products and could be expected to manifest injuries as a result. Here, although Piper has been involved in product liability litigation related to its manufacture, design, sale and distribution of aircraft and parts, and has expended considerable funds in such litigation, only a very small percentage of Piper aircraft will be involved in crashes, and only a fraction of those crashes are likely to result from prepetition manufacturing or design defects.

"claims" only for those individuals with some type of prepetition relationship with the Debtor. In *In re Pettibone Corp.*, 90 B.R. 918 (Bankr.N.D.Ill.1988), the debtor was sued for injuries sustained by the operator of a forklift designed and manufactured by the debtor before it filed its bankruptcy case. The claimant's employer purchased the forklift postpetition and therefore the claimant had no prepetition contact with the debtor or the forklift. The accident and the resulting injuries all occurred postpetition. The *Pettibone* court found that the facts before it were distinguishable from the asbestos and other mass tort cases where the injuries sustained could be tied to some type of prebankruptcy privity, contact, impact or hidden harm. *Id.* at 931. Because the operator's injury occurred postpetition without any prepetition relationship or exposure to tie the claimant to the debtor, the court held there was no "claim" as of the petition date. *Id.* at 932–33.

The Second Circuit suggested a similar analysis in *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir.1991). The issue in that case was whether the Environmental Protection Agency ("EPA") had a prepetition (and thus dischargeable) claim for environmental cleanup costs which would not be incurred until after confirmation, but which concerned environmental hazards related to prepetition conduct of the debtor.[10] The court tied the concept of "claim" to the prepetition relationship between debtor and claimant, finding that the relationship between environmental regulating agencies and the parties subject to regulation makes those contingent obligations based on prepetition conduct "claims" under the Code's definition. *Id.* at 1005. Thus, even though the EPA could not identify all of the sites or the full extent of the removal costs, the future environmental response costs for sites contaminated prior to filing of the bankruptcy petition were prepetition claims under the Bankruptcy Code.[11]

The finding in *Chateaugay* of a sufficient relationship is a narrow one, and that court expressly excluded several other scenarios from its holding. The court noted,

> We need not decide how the definition of "claim" applies to tort victims injured by pre-petition conduct, especially as applied to the difficult case of pre-petition conduct that has not yet resulted in detectable injury, much less the extreme case of pre-petition conduct that has not yet resulted in any tortious consequence to a victim.

*Id.* at 1004. In concluding that the degree of relationship between the debtor and the EPA was sufficient, the court found it "far closer than that between future tort claimants totally unaware of injury and a tort-feasor." *Id.* at 1005.[12]

Indeed, the *Chateaugay* court noted that defining claims to include any ultimate right to payment arising out of prepetition conduct by the debtor would yield questionable results. In pursuing this discussion, the court presented a hypothetical example of a company in bankruptcy which estimates that one out of the ten thousand bridges it built prepetition eventually will fail, causing the death of ten individuals. The court explored the problems inherent in attempting to recognize these "claims" pursuant to the Conduct Test:

> Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail some-

---

10. Under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the EPA, upon discovery of a release or substantial threat of release of hazardous substances into the environment, may either order the potentially responsible party to take remedial measures, or take such measures itself and then seek reimbursement for such response costs after they are incurred.

11. The court expressly noted that not all prepetition conduct would necessarily give rise to a prepetition claim, but only that conduct expressly contemplated by CERCLA to give rise to liability: "[T]he District Court did not go so far as to include CERCLA response costs attributable to any action of the debtor that occurred pre-petition, such as the construction of a storage facility. Instead, the Court carefully limited its ruling to pre-petition releases or threatened releases of hazardous substances." *Id.* at 1005.

12. At least one court has found that even the test applied in *Chateaugay* was too broad. *See In re Jensen*, 995 F.2d 925 (9th Cir.1993). In *Jensen*, the Ninth Circuit found that there must not only be a relationship between the claimant and the debtor, but that their prepetition interaction must be such that the claim is within the "fair contemplation" of the parties at the time of the bankruptcy. *Id.* at 930.

day in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's pre-petition conduct, the future victims have a "claim." Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim. The potential victims are not only unidentified, but there is no way to identify them. Sheer fortuity will determine who will be on that one bridge when it crashes.

*Chateaugay*, 944 F.2d at 1003.

The problem posed by this hypothetical has become reality here. We know that some planes in the existing fleet of Piper aircraft will crash, and we know that there may be injuries, deaths and property damage as a result. We also know that under theories of negligence and products liability, Piper, if it remains in existence, would be liable for some of these damages. Even so, there is no way to identify who the victims will be or to identify any particular prepetition contact, exposure, impact, privity or other relationship between Piper and these potential claimants that will give rise to these future damages.

### E. Analysis and Application

The Conduct Test and the Relationship Test are not mutually exclusive theories. Requiring that there be some prepetition relationship between the Debtor and claimant would not change the analysis or results of the Conduct Test cases. In fact, such a requirement appears to be implicit in those decisions. In the asbestos cases, the future claimants were individuals who were known to have had prepetition exposure to the dangerous product. *See, e.g., Waterman*, 141 B.R. at 556 (claims arose "at the moment the asbestos claimants came into contact with the asbestos"). Likewise, in *A.H. Robins*, the court determined that the claim arose when

the claimant was inserted with a Dalkon Shield. *Grady v. A.H. Robins Co.*, 839 F.2d at 203. And in *Edge*, the court noted that the Bankruptcy Code recognizes a claim for the victim of prepetition misconduct "at the earliest point in the relationship between victim and wrongdoer." *Edge*, 60 B.R. at 699. Thus, the Conduct Test cases presume not only that there was prepetition conduct, but also that there was some prepetition relationship between the debtor's conduct and the claimant.

■ The theories advanced by prior cases exploring the outer limits of the concept of claim, when thus reconciled, lead to the conclusion that in order for a future claimant to have a "claim" under § 101(5), there must be some prepetition relationship, such as contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant. This is not to suggest that any and every prepetition relationship will give rise to a claim.[13] Rather, a prepetition relationship connecting the conduct to the claimant is a threshold requirement.

■ In the instant case, the Claim advanced by the Legal Representative on behalf of the Future Claimants fails to fulfill this minimum requirement: the conduct upon which the claim is based, in its entirety, is merely the prepetition design, manufacture and sale of aircraft, without any discernible connection between that conduct and the Legal Representative's constituency.[14] There is no prepetition exposure to a specific identifiable defective product or any other prepetition relationship between the Debtor and the broadly defined class of Future Claimants. Since there is no way to connect the future claims to some prepetition relationship, there is also no way to identify a discrete class of individuals who will have claims arising out of prepetition conduct. In short, the Claim

13. Thus, the Court makes no finding that the relationship between Piper and prepetition owners of Piper aircraft would give rise to "claims" even for this relatively small and identifiable subclass of Future Claimants.

14. If the Legal Representative's proposed application of the Conduct Test had been adopted in the earlier cases, the claims in the asbestos and

Dalkon Shield cases would have arisen at the time of manufacture or design of the dangerous products, rather than at the time of contact between the products and the future claimants. The Conduct Test cases clearly did not reach such results on their facts, nor would they require the result sought by the Legal Representative here.

in this case fails even the broadest test for recognition of a "claim".

### F. Policy Considerations

Since no binding case law exists mandating the result here, the Court has also considered the policy implications of its decision. The Legal Representative and Pilatus argue that tying the issue of "claim" solely to whether the Debtor's conduct occurred prepetition would foster two primary policies of the Bankruptcy Code: (1) the effective reorganization of the Debtor, and (2) the equal treatment of similarly situated creditors. The Court disagrees.

Focusing on reorganization issues, Pilatus and the Legal Representative assert that an effective reorganization depends on Piper being relieved from liability arising out of the prepetition manufacture, design, sale or distribution of defective aircraft. They argue that this Court should therefore find that the Future Claimants hold dischargeable prepetition claims. This argument has several weak links.

First, unlike the Dalkon Shield and asbestos cases, the Debtor in this case does not believe that recognition of these future interests in the plan is necessary for its reorganization. Indeed, both the Debtor and the Committee conclude that allowing the Claim will hinder, not promote reorganization. Second, as revealed by the *Waterman* case, a determination that the Future Claimants hold "claims" would not necessarily mean that the claims are dischargeable. If they are not dischargeable, calling them "claims"

would not in any way facilitate Piper's reorganization. Here, significant and possibly insurmountable due process problems exist in providing notice to this vast class of Future Claimants sufficient to allow the discharge of their claims, regardless of the appointment of, and diligent efforts by, the Legal Representative. In sum, the Court cannot and does not find that recognizing the Future Claimants' "claims" will aid in an effective reorganization.[15]

Pilatus and the Legal Representative also argue that all individuals injured from Piper aircraft manufactured before confirmation should be treated equally, regardless of whether their injuries occur pre-confirmation or post-confirmation. Determining that the Future Claimants do not hold "claims," they argue, would cause disparate treatment based solely on the fortuity of when a crash occurs. This argument is framed by a hypothetical: Should crash victim Jones be able to share in plan distributions if his plane crashes pre-confirmation, while crash victim Smith receives nothing under the plan if his plane crashes post-confirmation?

The Court concludes that the answer is yes, their treatment can and should be different. In bankruptcy, as in life, timing matters.[16] There is a major distinction between Jones and Smith. Jones can be identified presently; Smith cannot. Only future events, impossible to predict at the time of confirmation of a plan, will determine who the future claimants will be, and whether Smith in fact will be one of them. Were Smith and his fellow claimants presently as-

---

15. The Legal Representative argues, correctly, that a plan could provide for the Future Claimants by setting aside some portion of the plan distributions for their benefit. However, the Legal Representative also has steadfastly asserted that Future Claimants must be found to have "claims" to be treated under a plan in the instant case. *Compare, Matter of Johns–Manville Corp.*, 68 B.R. 618, 628 (Bankr.S.D.N.Y.1986), *aff'd in part, rev'd in part*, 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988), in which the plan provided for future asbestosis victims without determining that they had claims. The theoretical ability to provide a fund for the Future Claimants does not help resolve the independent and threshold issue of whether or not they have "claims".

16. The simple truth that timing matters is evident in numerous provisions of the Bankruptcy Code, including the avoidance provisions in § 547 and § 548. Creditor Jones, paid in full 91 days before the petition, may keep his money while creditor Smith, paid the very next day, will have to disgorge the entire amount and share in any distributions to unsecured creditors. If timing was irrelevant, then Congress would have allowed the Trustee to reach back indefinitely to recover all prepetition payments made by insolvent debtors. Instead, Congress created a relatively arbitrary period of backward reach. Similarly, the Code does not permit or contemplate the indefinite, unlimited forward reach urged by the Legal Representative, even though it might foster the theoretical goal of equitable distribution.

certainable and identifiable, the answer might be different; but in the instant case it is impossible to determine who ultimately will belong to the class of creditors, and whether any prepetition relationship to the Debtor gives rise to their potential future causes of action.

Thus, the Court's decision today is not inconsistent with the statutory language, legislative history, or policies suggesting the "broadest possible definition" of claim. The concept of "claim" cannot be extended to include unidentified and presently unidentifiable potential claimants against this Debtor, claimants whose rights depend entirely on the fortuity of future occurrences and not on any prepetition relationship to the Debtor. Congress may have intended the broadest possible definition of claim, but that definition still has limits. One such limit is present here.

### EFFECT OF COURT'S RULING

In determining that the Future Claimants do not hold claims under the Bankruptcy Code, the Court is not determining whether any or all of the future victims may have a non-bankruptcy future remedy. The nature of the reorganization plan eventually confirmed in the case may affect the result as

will, in the event of a sale of Piper's assets, application of successor liability laws which may vary among the states. The ruling simply means that the future claims are not bankruptcy "claims" that will be administered in this case.[17]

### CONCLUSION

The definition of "claim" in the Bankruptcy Code is intentionally broad and sweeps within its scope remote and contingent obligations not necessarily actionable under state law at the commencement of a bankruptcy case. Still, the definition must and does have limits. Based upon the nature of Piper's prepetition conduct and the absence of any relationship between the class and Piper's prepetition activities, Piper's Future Claimants do not have "claims" in this case. The Committee's Objection is sustained, and the Claim filed by the Legal Representative is disallowed.

---

**17.** Since postpetition, pre-confirmation claims are not within the defined group of Future Claimants, this decision does not determine the nature or treatment of such claims.