**In re HOFFINGER INDUSTRIES, INC., Debtor.**

**No. 2:01–BK–20514.**

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

Jan. 14, 2004.

Stan D. Smith, Charles T. Coleman, Little Rock, AR, for the debtor.

James E. Smith, Jr., Little Rock, AR, for Bunch and McMasker.

James F. Dowden, Ben F. Arnold, Little Rock, AR, for Unsecured Creditors' Committee.

Charles W. Tucker, Little Rock, AR, Assistant United States Trustee.

## ORDER

RICHARD TAYLOR, Bankruptcy Judge.

On August 1, 2003, the debtor, Hoffinger Industries, Inc., [the "debtor" or "Hoffinger"] submitted its Statement of Estimated Future Claims [the "Statement"] for claims estimation under 11 U.S.C. § 502(c). In the Statement, the debtor created three components of an anticipated plan class:

(a) Claims made losses and reserves as of the Petition Date—$23,391,670;

(b) Liability for claims that are unknown, but for which accidents have occurred as of 06/30/2002—$2,910,592;

(c) Liability for claims that are unknown and have not yet occurred, related to products sold prior to the Petition Date—$2,150,850.

The Statement drew two objections, one from David A. Grace ["Grace"], the Future Claims Representative, the other from Lessa Bunch ["Bunch"]. For the reasons stated below, the Court sustains the objections with respect to components (a) and (b) with leave to amend, and sustains the objections with respect to component (c) with prejudice.

JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The following order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

HISTORY

The debtor manufactures above ground swimming pools, vinyl ladders, filters, and pool accessories with its principal manufacturing facility located in West Helena, Arkansas. On August 23, 2001, Bunch obtained a $13,522,177 judgment against the debtor in the Superior Court of Glenn County, California. In the same case, a $1,000,000 judgment against the debtor was also entered in favor of McMasker Enterprises, Inc. ["McMasker"]. The debtor filed its chapter 11 petition on September 13, 2001. Both the Bunch and McMaster judgments are on appeal. Additionally, in August 2002, shortly prior to its bankruptcy, the debtor paid to Kenny Coyle ["Coyle"] a personal injury judgment of approximately $2,700,000.

The debtor also has notice of unliquidated personal injury claims from known accidents. In particular, these involve Tommie Rousse and Christopher Lynn Reneau [together with the above, included in component (a) or the "Known Claims"].[1] The Known Claims could appreciably increase or decrease based upon judgments, resolutions, or claims made prior to the operative date.

On May 14, 2003, the debtor filed its Motion Pursuant to 11 U.S.C. § 502(c) For Unliquidated and Future Claims Estimation Procedures and Hearing [the "Claims Motion"]. The Claims Motion addressed two principal areas. First, the debtor sought to establish a procedure pursuant to § 502(c) for estimating the unliquidated Known Claims (part of component (a)). Second, the debtor suggested a class of Future Claims, which ultimately became Statement components (b) and (c). The debtor defined Future Claims as "un-

known personal injury claims related to pools and other goods or services supplied, sold, fabricated, provided or manufactured by the Debtor or an agent of the Debtor prior to the Confirmation Date." (Claims Mot. ¶ 6.) This contemplates an estimation of the class of claims unknown to the debtor resulting from accidents prior to a set date (presumably the petition or confirmation date) (component (b)) and claims that are unknown and have not yet occurred, but which will occur post-confirmation, related to products sold or manufactured prior to the operative date (again, either the petition or confirmation date[2]) (component (c)).

Component (c) addresses claimants who are injured post confirmation by a pool or accessory sold or merely manufactured preconfirmation. The Statement definition of component (c)—"products sold prior to the Petition Date" (Statement ¶ 15(c))—is more restrictive than its intended use in the debtor's plan. The debtor broadens the component to include not only products "sold" by the confirmation date (or the petition date, whichever the debtor finally uses), but also products merely "supplied, ... fabricated, provided or manufactured" by the debtor prior to the confirmation date. (Claims Mot. ¶ 6; Statement ¶¶ 7, 8.) Presumably, the expected plan (including a channeling injunction discussed later) would relate to products manufactured prior to confirmation (Claims Mot. ¶ 8; Statement ¶ 8) but still sitting in the debtor's warehouse, awaiting perhaps the unborn child of a neighbor who has not yet moved next door to someone who has not yet built a house but someday will, and will install a preconfirmation built Hoffinger pool that the eventually born child will swim in and

---

1. By the estimation hearing, Matthew and Katherine Brock ["Brock"] had also asserted a known but unliquidated claim.

2. It is unclear which date the debtor will actually use at plan confirmation.

suffer an injury. As will be discussed below, component (c) is a bridge too far.[3]

The debtor intends to use the estimation process for two purposes. First, the estimates would be used for determining feasibility and voting on the debtor's plan. Second, the debtor's plan contains an injunction, similar to a channeling injunction provided by § 524(g) of the Bankruptcy Code. This would enjoin all products liability and personal injury claims against the debtor or reorganized debtor arising out of or related to pools and other goods or services supplied, sold, fabricated, provided, or manufactured by the debtor or an agent of the debtor prior to the confirmation date. The injunction would require that any such claims could only be asserted against a products liability fund created, implemented, and funded pursuant to the debtor's plan. (Claims Mot. ¶ 8.) All three components are to be combined in a single personal injury exposure total estimated at $28,453,112, with the Future Claims estimated at $5,061,442.

The Claims Motion and the debtor's motion for appointment of a future claims representative were heard on June 24, 2003, and resulted in Judge Mixon's July 10, 2003, Order on Motion For Appointment of Future Claims Representative and to Establish Claims Estimation Procedures [the "Claims Order"]. In that order, the Court appointed Grace as the Future Claims Representative and established a procedure for estimating the known unliquidated claims and the Future Claims.

The Claims Order provided that the estimations were for purposes of voting on the plan and determining the total estimated claims to be administered as a class in the debtor's proposed plan of reorganization. The estimates would not be proof of the allowed amount of any claim.[4]

On August 1, 2003, the debtor filed its Statement as per the Claims Order. The Statement quantified the three claim components set forth above. Bunch and Grace both filed objections and a hearing was set for December 22, 2003. Shortly prior to the hearing, Bunch filed a motion for continuance citing, *inter alia*, a lack a supporting documentation from the debtor. At a telephonic hearing held December 15, 2003, Grace joined in the continuance request. The debtor contested a continuance and the Court determined that the December 22 hearing would proceed. Between December 15 and December 22, the debtor apparently provided a great deal of information to both Bunch and Grace. Additionally, and having made no mention of its probable matriculation during the December 15 hearing, the debtor also filed on December 19, the Friday before the Monday hearing, a Supplement to Statement of Estimated Future Claims [the "Supplement"].

MOTION IN LIMINE

The belated filing of the Supplement immediately drew a motion in limine from Grace pursuant to Federal Rule of Bankruptcy Procedure 7037. At the beginning of the December 22 hearing, the Court

---

3. Cornelius Ryan, *Bridge Too Far* (Simon & Schuster 1974); *see also Perspectives*, Newsweek, Dec. 29, 2003/Jan. 5, 2004, at 113 (Donald Rumsfeld, clarifying certain U.S. policy: "There are known knowns. These are things we know that we know. There are known unknowns. That is to say, there are things that we know we don't know. But there are also unknown unknowns. There are things we don't know we don't know.").

This perhaps suffices for some purposes, but not due process in a chapter 11 reorganization.

4. A later suggestion in the debtor's Statement that the claim amount as estimated would also relate to distribution (Statement ¶ 11) was clarified and withdrawn on the record by the debtor at the December 22, 2003, hearing.

granted Grace's motion and excluded the Supplement. In doing so, the Court found that the Supplement substantively amended the Statement, was prejudicial to the objecting parties (as previously noted, the debtor objected to a continuance), and wholly failed to comply with the notice and objection procedure set forth in the Claims Order. The exclusion of the Supplement meant that the Statement was factually flawed. However, as will be discussed in greater detail below, the debtor will be permitted an opportunity to resubmit a statement that presumably will be amended consistent with the Supplement and any other changes suggested by and pertinent to the original Statement.

### OBJECTIONS

On December 22, 2003, the Court heard the objections to the Statement filed by Bunch and Grace. Each component will be addressed in turn.

### COMPONENT (a)

This component consists of "[c]laims made losses and reserves as of the Petition Date." (Statement ¶ 15(a).) The debtor filed its petition on September 13, 2001. The debtor's expert, Charles C. Pearl, Jr. ["Pearl"], assigned this component a figure of $23,391,670. Pearl testified it included all claims known to the debtor, however noticed, including current litigation. It appears to consist of two subparts. The first is the aggregate of the known liquidated claims, such as Bunch, McMasker, and Coyle. Apparently, the debtor in its plan will include the unsecured portions of the above claims in the aggregate tort claim class, referred to as Class I. (Statement ¶ 7.) The second subpart is the broader category of known but unliquidated liability exposure to the debtor for pools and

liners sold before September 13, 2001 (the petition date), and/or the evaluation date of June 30, 2002. (Statement ¶ 14.)[5]

As indicated above, the Court granted Grace's motion in limine and excluded the Supplement. Regardless, it was clear from Pearl's testimony that subsequent events mandate an amended Statement. Specifically, but not by way of limitation, Pearl's testimony reflected that he may need to reallocate his loss adjustment expenses, including any costs in resolving claims as they relate to potential legal expenses. Further, he testified that the Coyle judgment has been paid and should be removed from this component. Also, the Brock claim came to light in late summer of 2003 and as such should be removed from component (b) and reallocated to component (a). Additionally, the Brock claim has been stipulated for estimation purposes at $4,500,000. On the day of the hearing the debtor in a related hearing introduced a written stipulation assigning an estimate of $3,700,000 to Reneau's claim. Mr. Pearl also testified that a new claim, the Rousse claim, has been made for $1,200,000.

Clearly, adjustments to this component will have to be made with either a firm conclusion date or an adequate and acceptable vehicle for amendment. Given the stipulations, the component (a) estimation methodology seems appropriate and acceptable to the Court for voting and feasibility purposes. The Court sustains the objections related to component (a) without prejudice so the debtor can make the required amendments.

### COMPONENTS (b) AND (c) [FUTURE CLAIMS]

The estimation of these two categories of claims unknown to the debtor require

---

**5.** It should be noted that the Court is not at this time making any determination as to whether the inclusion of any part, secured or unsecured, or whole of the known liquidated

claims, such as Bunch and McMasker, is appropriate in projected Class I. The classification issue will be addressed at plan confirmation.

greater scrutiny. Specifically, § 502(c) provides that the court may estimate for allowance purposes, "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case . . . ." This Court must decide if components (b) and (c) are amenable and appropriate to the estimation process. The Court concludes that (b) is; (c) is not.

There are two independent but mutually supporting basis for this conclusion. First, this is not a mass tort case based upon a product for which there is substantial authority, either through admissions or a body of judicial findings, that the product is intrinsically or inherently defective or dangerous such that, similar to a class-action, users would be on notice that they had a claim.

Second, § 101(5) of the Code defines "claim" as a "right to payment . . .," which, applying its plain meaning, reflects another party. That entity may have a claim that is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5). The Code does not define "claim" from the chapter 11 debtor's perspective as an "obligation to pay" (which, if contingent, might imply a "we built a pool and one day we might have to pay someone injured by it" analysis). Viewed from the correct perspective, the focus must be on identifying that other party and protecting his or her due process rights. Section 502(c) further restricts the definition of claim for estimation purposes to "contingent or unliquidated" claims. The plain reading of the Code's "claim" definition and the § 502(c) "contingent" restriction requires some log-

ical prepetition nexus between the product and the actual and specific person harmed.[6] In the absence of a suitable class-action basis, satisfaction of due process requires more than mere existence on planet Earth (and in this instance, perhaps the unborn) that puts the person harmed, *i.e., the claimant,* on notice that he or she has a claim.

Accordingly, the Court must first determine if due process has been met before allowing the estimation process on this component to proceed, rather than an *ad hoc* post estimation/confirmation review to determine inclusion or exclusion from the estimated class. Just owning or eventually buying a preconfirmation produced pool, or currently or eventually living next to, near, or in the same state as someone who has, or post confirmation will have, one of the above, and maybe one day using it and being injured, is simply not enough. To hold otherwise would result in every chapter 11 debtor, without mass tort or class-action exposure, creating a component (c) class to restrict comprehensively damage recovery for future injuries for chairs, shoes, or whatever else it produces. This Court concludes that component (c) intrinsically fails to satisfy bare minimum due process requirements and is not appropriate for estimation under § 502(c). The unknown persons defined in component (c) simply do not hold claims under § 101(5), as defined and as limited by the "contingent or unliquidated" clause in § 502(c). Those in component (b) do. Further, the Court finds that nothing in the record supports a conclusion that failure to estimate these claims, if in fact they are, would unduly delay the administration of the case as required by § 502(c). A failure to estimate claims for injuries result-

6. See the discussion of *In re Piper Aircraft Corp.,* 162 B.R. 619 (Bankr.S.D.Fla.1994), *in-* *fra.*

ing in the future from a pool sitting on a warehouse shelf simply does not unduly delay case administration.

ANALYSIS

In order to establish estimates for unknown claims, the debtor created two components:

> (b) Liability for claims that are unknown, but for which accidents have occurred as of 06/30/2002—$2,910,592; and
>
> (c) Liability for claims that are unknown and have not yet occurred, related to product sold prior to the Petition Date—$2,150,850.[7]

The Bankruptcy Code defines claim as a:

> right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured ....

11 U.S.C. § 101(5). The legislative history of the Code suggests Congress intended to define the term "claim" very broadly:

> The effect of the definition [of claim] is a significant departure from present law [i.e., the Bankruptcy Act]. Under present law, "claim" is not defined in straight bankruptcy. Instead, it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of present law far more broadly. The definition ... adopts an even broader definition of claim than is found in the present rehabilitation chapters.... By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contin-

gent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, at 309 (1977); S.Rep. No. 989, at 21–22 (1978), U.S.Code Cong. & Admin.News 1977, 5963, 6266, 5787, 5807–08.

■■■ A request for estimation of a claim or right to payment is a contested matter that is subject to Federal Rule of Bankruptcy Procedure 9014. The court is to use whatever method is best suited to the particular contingencies at issue. *In re Interco Inc.*, No. 91–40442–172, 1992 WL 361107, at *7 (Bankr.E.D.Mo. Nov.19, 1992) (citing *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135 (3d Cir.1982)). This Court may not estimate contingent or unliquidated personal injury or wrongful death claims for purposes of distribution, but may do so for purposes of determining the feasibility of a plan of reorganization. 28 U.S.C. § 157(b)(2)(B). *See also A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1012 (4th Cir.1986); *In re Johns–Manville Corp.*, 45 B.R. 823, 826 (S.D.N.Y.1984).

As indicated above, claims in component (b) are restricted to persons unknown to the debtor but injured in accidents occurring preconfirmation. The Court credits Pearl's unrebutted testimony as to the methodology used in estimating this class for feasibility and voting purposes only. Based on the company's history, his methodology appears to be a reasonable method of estimating current claims related to accidents that have occurred. As with component (a) above, the Court will sustain the objections with respect to component (b) without prejudice so the debtor can make the required amendments.

---

7. Again, this component (c) definition is more restrictive that its contemplated use in the debtor's proposed plan. *See* note 2 and accompanying text.

Component (c) consist of claims for accidents that have not yet occurred (but which will occur post-confirmation to persons unknown), related to product sold, fabricated, provided, or manufactured prior to the confirmation date. Several factual predicates are significant to the Court's analysis of this component. First, there is no indication or admission that the products manufactured by the debtor are inherently defective or dangerous. It is not contended that, like asbestos or certain inter-uterine devices, mere exposure or contact results in either immediate or latent damage or injury.

Second, the facts do not demonstrate a significant number of existing or probable claims unusual in the pool manufacturing industry. This simply is not a mass tort case with a "mounting tide of claims . . . ." *A.H. Robins Co.*, 788 F.2d at 996. Although it appears that a rather extraordinary claim, the Bunch/McMaster verdict, was the principal cause of this bankruptcy, the tide appears to be toward less, not more, products liability litigation. An officer for the debtor twice testified that he could see the "light at the end of the tunnel" on suits of this nature. He indicated that in the 1980s, pool manufacturers lost a number of cases, but collectively showed a more positive trend in the 1990s after the adoption of more comprehensive warning labels. He indicated the debtor led the industry in developing these labels, which were endorsed by the consumer safety products administration. He was not aware of any pool or lining manufactured since 1992 that had generated a claim against the debtor. A comprehensive historical listing of all claims, resolved and pending, reflected 72 claims. Only one appeared to involve a product produced after 1992. The vast majority of the accident dates were in the 1980s or early 1990s. Again, the facts indicate less, not more, litigation and exposure.

In *In re Piper Aircraft Corp.*, 162 B.R. 619 (Bankr.S.D.Fla.1994), the debtor, an airplane manufacturer, filed bankruptcy as a result of the economic strain occasioned by escalating litigation costs in connection with multiple product liability claims. Piper never acknowledged that its products were inherently harmful or defective. Its anticipated plan of reorganization contemplated a future claimants class with an appropriate class representative. The class representative's claim drew objections that forced the court to consider whether this class in fact held claims against the estate as contemplated by the Bankruptcy Code. Future claimants in *Piper* were defined as follows:

All persons, whether known or unknown, born or unborn, who may, after the date of confirmation of Piper's chapter 11 plan of reorganization, assert a claim or claims for personal injury, property damage, wrongful death, damages, contribution and/or indemnification, based in whole or in part upon events occurring or arising after the Confirmation Date, including claims based on the law of product liability, against Piper or its successor arising out of or relating to aircraft or parts manufactured and sold, designed, distributed or supported by Piper prior to the Confirmation Date.

*Id.* at 621 n. 1. Based on a statistical analysis, the Piper future claims representative filed a claim in the approximate amount of $100,000,000. The Piper future claims class differs little from Hoffinger's suggested component (c).

The Piper future claims representative argued that because Piper aircraft and related parts sold prepetition would be involved in post confirmation accidents, the individuals suffering damage as a result of those accidents, although not yet identified, did hold claims against the estate.

As a predicate to its analysis, the *Piper* court agreed that,

> [b]ased upon the statutory language and legislative history, virtually all courts agree that the definition of claim is expansive. The question is, how far can the concept of "claim" be expanded? In referring to the legislative history, one court has observed, "That language surely points us in a direction, but provides little indication of how far we should travel," *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991).

*Id.* at 623 (citations omitted).

Prior to *Piper*, three theories had emerged, principally in the mass tort context. The first and most restrictive is the accrued state law claim theory adopted by the Third Circuit in *Avellino & Bienes v. M. Frenville Co.* (*In re M. Frenville Co.*), 744 F.2d 332 (3d Cir.1984). Under this theory, a bankruptcy claim does not exist until a claim has accrued under state law. Hoffinger's component (c) class certainly does not meet this standard.

The second theory, the conduct test theory, was adopted by the Fourth Circuit in *Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.1988). This theory suggests that "a right to payment arises when the conduct giving rise to the alleged liability occurred." *Piper*, 162 B.R. at 624. *A.H. Robins* involved intra-uterine devices where the only contingent or uncertain event was the manifestation of injury, but that "all of the acts constituting the tort other than the manifestation of injury had occurred prior to the petition date." *Id.* (citing *A.H. Robins*, 839 F.2d at 201).

The *Piper* court found that this standard failed to provide a sufficient basis for inclusion of these future claims. The court stated as follows:

The Legal Representative urges a similar application of the Conduct Test in this case, with the relevant conduct being Piper's prepetition manufacture, design, sale and distribution of allegedly defective aircraft. However, unlike the asbestos and Dalkon Shield cases, the Legal Representative cannot pinpoint which aircraft or parts are defective or, more significantly, who will be exposed to the defective product in the future. In effect, under the Conduct Test, everyone in the world would hold a claim against Piper simply by virtue of their potential future exposure to any plane in the existing fleet. The conduct of Piper purporting to support the existence of prepetition "claims" is readily distinguishable from the conduct of the asbestos and Dalkon Shield manufacturers. Thus, the Court rejects application of a Conduct Test that would give rise to "claims" simply because the design and manufacture of products occurred prepetition.

*Id.* at 625 (footnote omitted).

Under this standard, Hoffinger's efforts would fail. Here, the Court's inquiry into Hoffinger's component (c) could end as the Claims Motion suggests a class of those injured by not only goods sold or supplied by the confirmation date, but also goods merely fabricated, supplied, or manufactured by the confirmation date. (Claims Mot. ¶ 6; Statement ¶¶ 7, 8.) However, the Court notes that Hoffinger's proposed plan filed May 1, 2003, at least implies that Hoffinger may restrict Class I with respect to future claims to personal injury claims arising out of or relating to products *purchased* prior to the confirmation date. (The Debtor's Proposed Plan of Reorganization, section 1.103, and the Statement, despite other contradictory comments, defines component (c) as "products

sold prior to the Petition Date." [8]) Accordingly, the Court's inquiry should continue.

The third theory, the prepetition relationship theory, recognizes " 'claims' only for those individuals with some type of prepetition relationship with the Debtor." *Piper,* 162 B.R. at 625–26 (referring to *In re Pettibone Corp.,* 90 B.R. 918 (Bankr. N.D.Ill.1988)). The *Piper* court found as follows:

> In the instant case, the Claim advanced by the Legal Representative on behalf of the Future Claimants fails to fulfill this minimum requirement: the conduct upon which the claim is based, in its entirety, is merely the prepetition design, manufacture and sale of aircraft, without any discernible connection between that conduct and the Legal Representative's constituency. There is no prepetition exposure to a specific identifiable defective product or any other prepetition relationship between the Debtor and the broadly defined class of Future Claimants. Since there is no way to connect the future claims to some prepetition relationship, there is also no way to identify a discrete class of individuals who will have claims arising out of prepetition conduct. In short, the Claim in this class fails even the broadest test for recognition of a "claim."

*Id.* at 627–28 (footnote omitted).

 Several key points are implicit in the above statement. First, the court's conclusion in *Piper* is consistent with the plain reading of the Code's definition of claim as a "right to payment," versus an "obligation to pay" discussed above. The former properly focuses the analysis on the other, discrete, non-debtor party, and his or her due process rights. Second, the definition of claim in § 101(5) is modified for purposes of estimation pursuant to § 502(c) to "contingent or unliquidated" claims. The ambiguous and troublesome concept of "unmatured," found in § 101(5), is obviated by this restriction. Third, the Court is not required to perform an estimation process in a vacuum. Although the vehicle used by Pearl, Hoffinger's expert, is no less reasonable than any insurance company making projections of potential liability, the use of this estimation to create a class of future claimants bound by the plan requires the Court to make the threshold decision whether the suggested class is appropriate.

██ The class of claimants in component (b) satisfy these minimum requirements. Each individual has had an accident prepetition and, although they apparently have not made their claim known to the debtor, they are fully aware that they may have a cause of action against or right to payment from some entity for the injury suffered.[9] In occupying that status, they have the same risk as any claimant that the responsible party might go out of business, have insufficient assets to pay a judgment, be insufficiently insured, or file bankruptcy. These are the normal recovery risks attendant to suffering a products liability injury. Also, it is appropriate to estimate this class for purposes of plan voting and determining feasibility.

---

8. The Court may take judicial notice of its own orders and records in a case before the court. Fed.R.Evid. 201; *Elliott v. Papatones,* 143 F.3d 623, 624 (1st Cir.1998).

9. The Court is not at this time deciding on the appropriate operative date for this class; it just notes that for estimation purposes the accidents are at least occurring preconfirmation. The issue of whether the petition date is the proper operative date is reserved for the confirmation hearing.

■ Conversely, the members of component (c) injured in the future also run the risk that the alleged tortfeasor might already be out of business, uninsured, dissolved, or reorganized in bankruptcy. However, due process demands they should not find out belatedly, without notice or opportunity to participate, that their rights have been substantively and with *res judicata* effect resolved.

■ This is not a class-action lawsuit with attendant procedural due process regarding both identification and notice to the putative class. This is a chapter 11 bankruptcy. Claims require claimants, which Black's Law Dictionary defines as "[o]ne who asserts a right or demand, ..." and which the Bankruptcy Code generally refers to as a "creditor," meaning an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). If the debtor does not fully know who the claimants are, the claimants should at least know who they are. More importantly, "they" should at least exist to qualify as "claimants" holding "claims." The persons who may eventually be in component (c), including the future unborn, simply do not. The post confirmation person unknown, unborn, or about to take their first swimming lesson simply does not have a logical prepetition nexus to Hoffinger's products. Due process demands more than component (c) allows. *See A.H. Robins Co.*, 788 F.2d at 1014 (" '[d]ue process' does not establish an inflexible standard to be rigorously applied in all cases"). It is " 'a delicate process of adjustment' and of a balancing of interests in which it is recognized 'that what is unfair in one situation may be fair in another ....' " *Id.* (citing *McClelland v. Massinga*, 786 F.2d 1205 (4th Cir.1986)).

In *Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft*

*Corporation)* 168 B.R. 434 (S.D.Fla.1994), the court stated,

for a "claim" to exist, there must be some way to connect the future claims to the debtor today, such that it can be fairly said that Piper's obligations to the Future Claimants are sufficiently rooted in the present. *See In re UNR Industries, Inc.*, 20 F.3d 766 (7th Cir.1994) ("Bankruptcy separates the past and future of an enterprise, satisfying claims attributable to yesterday's activities out of existing assets ..."). In that regard, the Bankruptcy Court properly required more than a prepetition conduct by Piper. It determined that some "prepetition relationship" between the debtor and the future claimants must exist in order for a future claimant to have a "claim" under the Code.

*Id.* at 439.

Also,

[t]he Court does not agree that these groups are similarly situated. At the time of its bankruptcy filing, Piper owed legal obligations to the unsecured creditors. That group had a "right to payment" from Piper. In contrast, the Future Claimants do not have a right to payment because Piper owed no legal obligations to them at the time of its filing.

*Id.* at 440. The Eleventh Circuit adopted a modified *Piper* test as follows:

We therefore modify the test used by the district court and adopt what we will call the "Piper test" in determining the scope of the term claim under § 101(5): an individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product; and, (ii) the basis for liability is the debtor's prepetition conduct in designing, manu-

facturing and selling the allegedly defective or dangerous product. The debtor's prepetition conduct gives rise to a claim to be administered in a case only if there is a relationship established before confirmation between an identifiable claimant or group of claimants and that prepetition conduct.

*Epstein v. Official Comm. of Unsecured Creditors*, 58 F.3d 1573, 1577 (11th Cir. 1995).

In the first instance, Hoffinger's component (c) fails to meet this criteria, both as stated by the lower court and the court of appeals, principally because it includes potentially any person, born or unborn at confirmation, who might use and be injured in a prepetition manufactured Hoffinger pool sometime in the future, whether purchased by them or not.

■ In the second instance, Hoffinger's component (c) might not ever meet this criteria or suffice to afford third parties due process if the terms "individual" and "individual claimant" are given their proper emphasis.[10] Specifically, there still has to be a claimant for there to be a claim. In the absence of a suitable class-action basis, due process demands that the person harmed, *i.e.*, the claimant, be on notice that he or she has a claim. Black's Law Dictionary states that a claimant is "one" who asserts a claim. The Code defines "creditor" as an "*entity* that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10) (emphasis added). The debtor had no known or

definable legal obligations to component (c) at the time it filed its petition. More importantly, given the proper reading of the Code's definition of "claim," the claimants are unidentifiable, unknown, and have absolutely no "right to payment" from the debtor. *See* 11 U.S.C. § 101(5). It is this third party's "right to payment," that, while known, may be contingent, which is defined as "possible; uncertain; unpredictable." [11] *See* Black's Law Dictionary 315 (7th ed.1999).

As stated above, this is clearly not a mass tort case. No reasonable or rational class of people injured in the future presently exists in this instance outside the normal and prudent exercise of potential exposure analysis for insurance purposes. Hoffinger seeks to elevate the conclusions of that analysis to adjudicate substantively the rights of a class of claimants who simply do not exist, either at the petition or confirmation date.

CONCLUSION

For the above reasons, the Claims Representative's and Bunch's objections are sustained with respect to components (a) and (b) with leave for the debtor to file a modified statement within 25 days of the entry of this order and provide notice consistent with the Claims Order. Any objecting party shall have 15 days within which to file a response. Other than as provided herein, this estimation process is still subject to, and the parties should proceed in accordance with, the Claims Order.

10. Hoffinger uses the term "persons" in its pleadings. (Statement ¶ 7; Debtor's Proposed Plan of Reorganization, section 1.103.) The proposed plan is silent regarding its stated definitions of "Claim" and "Claimant" in defining Class I in terms of "Person" and "Unliquidated Personal Injury Claimants," which is odd given it currently wishes to have the Court estimate these "claims."

11. This is not to suggest that there will not be instances where, such as a mass tort case, a class of individuals, not all of whom will be specifically identifiable, cannot be certified with the appropriate *res judicata* and preclusive effects.

The objections as to component (c) are sustained with prejudice.

IT IS SO ORDERED.