**In re PIPER AIRCRAFT CORPORATION,**
Debtor.

**David G. EPSTEIN, Legal Representative for the Piper Future Claimants,**
Appellant,

v.

**The OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF the ESTATE OF PIPER AIRCRAFT CORPORATION, Appellee.**

No. 94–8044–CIV.
Bankruptcy No. 91–31884–BKC–RAM.

United States District Court,
S.D. Florida.

June 6, 1994.

David G. Epstein, James N. Gorsline, Paul Ferdinands, King & Spalding, Atlanta, GA, Robert E. Venney (Local Counsel), Shutts & Bowen, Miami, FL, for appellant David G. Epstein.

Howard J. Berlin, Kluger, Peretz, Kaplan & Berlin, Miami, FL, for appellee The Official Committee of Unsecured Creditors.

Paul S. Singerman, David C. Pollack, Stroock & Stroock & Lavan, Miami, FL, for debtor Piper Aircraft Corp.

Oscar R. Cantu, Weil, Gotshal & Manges, Miami, FL, for Pilatus Aircraft Ltd., amicus curiae.

## ORDER AFFIRMING DECISION OF BANKRUPTCY COURT

ARONOVITZ, District Judge.

This is an appeal by Appellant David G. Epstein, as the Legal Representative for the Piper Future Claimants, from the Order Sustaining Objection to Claim and Disallowing Legal Representative's Proof of Claim entered on December 6, 1993 by Judge Robert A. Mark of the United States Bankruptcy Court for the Southern District of Florida. The sole issue for appellate consideration is whether the class of "Future Claimants," as defined by the Bankruptcy Court, hold "claims" against the estate of Piper Aircraft Corporation ("Piper") within the meaning of § 101(5) of the United States Bankruptcy Code.

The Court has carefully considered the briefs on appeal, including the *amicus curiae* brief of Pilatus Aircraft Limited ("Pilatus"), oral argument of counsel, the decision of the Bankruptcy Court, the applicable case law, the relevant provisions, policies and goals of the Bankruptcy Code, and the pertinent portions of the record, and is otherwise fully advised in the premises. For the following reasons, this Court ACCEPTS and AFFIRMS the decision of the Bankruptcy Court and holds that the "Prepetition Relationship" Test is the most appropriate test in determining whether a "claim" exists in favor of the Future Claimants herein.

### Factual and Procedural Background

The factual and procedural history of this appeal is fully set forth in the Bankruptcy Court's Memorandum Opinion, *see In re Piper Aircraft Corp.*, 162 B.R. 619 (Bankr. S.D.Fla.1994), and therefore need not be repeated here in its entirety. For purposes of this appeal, the relevant facts are as follows.

On July 1, 1991, Piper filed a voluntary petition under Chapter 11 of the Bankruptcy

Code in the United States Bankruptcy Court for the Southern District of Florida. Piper has been manufacturing and distributing general aviation aircraft and spare parts throughout the United States and abroad since 1937. Approximately 50,000 to 60,000 Piper aircraft are still operational in the United States. Although Piper has been a named defendant in several lawsuits based on its manufacture, design, sale, distribution and support of its aircraft and parts, it has never acknowledged that its products are harmful or defective.

On May 19, 1993, the Bankruptcy Court appointed the Appellant, David G. Epstein, as the legal representative (the "Legal Representative") for future claimants to represent their interests in the bankruptcy case.[1] The Bankruptcy Court defined the class of "Future Claimants" to include:

> All persons, whether known or unknown, born or unborn, who may, after the date of confirmation of Piper's chapter 11 plan of reorganization, assert a claim or claims for personal injury, property damages, wrongful death, damages, contribution and/or indemnification, based in whole or in part upon events occurring or arising after the Confirmation Date, including claims based on the law of product liability, against Piper or its successor arising out of or relating to aircraft or parts manufactured and sold, designed, distributed or supported by Piper prior to the Confirmation Date.

*See* May 19, 1993 Order (Mark, J.). The Order expressly stated that the court was making no finding on whether the Future Claimants even hold claims against Piper under § 101(5) of the Code.

On July 12, 1993, the Legal Representative filed a proof of claim on behalf of the Future Claimants in the approximate amount of $100,000,000. The Appellee, the Official Committee of Unsecured Creditors (the "Committee"), objected to the claim on the ground that the Future Claimants do not hold § 101(5) claims against Piper. Piper later joined in the objection. A hearing on the objection was held in the Bankruptcy

Court on September 2, 1993, and on September 10, 1993, the court announced its ruling that the Future Claimants do not hold claims under the Bankruptcy Code. Accordingly, on December 6, 1993, the Bankruptcy Court entered an Order Sustaining the Committee's Objection and Disallowing the Legal Representative's Proof of Claim. In a Memorandum Opinion dated January 14, 1994, the Bankruptcy Court entered its final findings of fact and conclusions of law to support its December 6, 1993 Order disallowing the Legal Representative's proof of claim. *See Piper, supra.* This appeal followed.

***Discussion***

The Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a). The sole issue on appeal is whether any of the Future Claimants hold claims against Piper under § 101(5) of the Bankruptcy Code. This issue is a question of law, to which the Court will apply a *de novo* standard of review. *See In re Chase & Sanborn Corp.,* 904 F.2d 588, 593 (11th Cir.1990) (conclusions of law are subject to *de novo* standard of review); *In re Sublett,* 895 F.2d 1381 (11th Cir.1990) (same).

### A. STATUTE AND LEGISLATIVE HISTORY

■ The Court's analysis must begin with the statutory definition of the term "claim." The Bankruptcy Code defines "claim," in relevant part, as a "right to payment," whether or not such right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. 11 U.S.C. § 101(5)(A). The legislative history of the Code indicates that Congress intended the term "claim" to be given broad interpretation so that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2nd Sess. 309 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6266; *see also, Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d 649 (1985); *In re St. Laurent II,* 991 F.2d 672, 678 (11th Cir.1993) ("[t]he legisla-

---

**1.** The appointment was the result of a request by Pilatus, a potential purchaser of all or substantially all of Piper's assets, that a legal representa-

tive be appointed to represent the interests of future claimants who will bring future product liability claims.

history of the Bankruptcy Code indicates that 'claim' was to be given the 'broadest possible definition' ").

The question is how broad is the broad definition of claim. Does it extend to "future claimants," a term that is not defined or used in the Bankruptcy Code? As stated by one court, the legislative history "surely points us in a direction, but provides little indication of how far we should travel." *In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991).

### B. CASE LAW

The issue at bar—whether future claimants hold § 101(5) claims under the Bankruptcy Code—is really one of first impression.[2] Three theories, however, have evolved in case law that are relevant to this issue, namely the accrued state law theory,[3] the conduct theory (discussed *infra*) and the prepetition relationship theory (discussed *infra*). The Bankruptcy Court employed the prepetition relationship test and concluded that none of the Piper Future Claimants has a claim under § 101(5) because there exists no prepetition relationship, such as contact, exposure, impact or privity, between Piper's prepetition conduct and the claimants. *See Piper*, 162 B.R. at 627.

The Legal Representative challenges the lower court's decision primarily on the ground that the application of the prepetition relationship test effectively disregards and removes the words "contingent" and "unmatured" from the statutory definition of "claim." He further claims that the test is inconsistent with the policies and goals of the

Bankruptcy Code. The Legal Representative supports the application of the "Conduct Test," which several courts have adopted in the mass tort cases involving asbestos or the Dalkon Shield.[4] Under this test, a right to payment arises "at the moment when acts giving rise to the alleged liability are performed." *See Waterman*, 141 B.R. at 556; *see also, A.H. Robins*, 839 F.2d at 199; *In re Johns–Manville*, 57 B.R. 680, 690 (Bankr. S.D.N.Y.1986).

In applying the Conduct Test to this case, the Legal Representative argues that the relevant conduct "giving rise to the alleged liability" was Piper's prepetition manufacture, design, sale and distribution of defective products. The argument is that since all of these acts were performed prior to the filing of Piper's petition, the Future Claimants hold § 101(5) claims against Piper. However, as discussed in detail below, it was not the debtor's prepetition manufacture, design or sale of a defective product that triggered the "right to payment" in the Conduct Test cases. Simply stated, the Conduct Test cases do not compel the result sought by the Legal Representative.

The factual situation of the Conduct Test cases differs significantly from the facts in the instant case. *A.H. Robins*, a leading Conduct Test case, involved a plaintiff who suffered postpetition symptoms from the use of a Dalkon Shield interuterine device that was inserted in her several years before the manufacturer's bankruptcy. The Court of Appeals for the Fourth Circuit in that case ruled that the plaintiff's claim arose before

---

**2.** The Court is aware of only one case in which this issue was squarely considered and ruled upon by a court. That case is *In re Waterman S.S. Corp.*, 141 B.R. 552 (Bankr.S.D.N.Y.1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y. 1993) (discussed *infra*). The other cases referred to herein have considered the issue only in *dicta* during the course of addressing various other future claim related issues.

**3.** The most notable decision adopting the accrued state law theory is the Third Circuit's opinion in *In re M. Frenville Co.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). Under the *Frenville* accrued state law theory, there is no claim for bankruptcy purposes until a claim has accrued under state law. This theory has been widely

criticized and rejected by the majority of the courts as imposing a too narrow interpretation of the term "claim." *See, e.g., In re Black*, 70 B.R. 645 (Bankr.D.Utah 1986); *Acevedo v. Van Dorn Plastic Machinery Co.*, 68 B.R. 495 (Bankr. E.D.N.Y.1986); *In re Yanks*, 49 B.R. 56 (Bankr. S.D.Fla.1985). For the reasons stated by the Bankruptcy Court, *see Piper*, 162 B.R. at 624, this Court likewise declines to follow *Frenville*.

**4.** *See, e.g., Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.), *cert. denied sub nom., Joynes v. A.H. Robins Co.*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988) (Dalkon Shield); *Waterman, supra*, (asbestos); *In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984) (asbestos); *see also, In re Edge*, 60 B.R. 690 (Bankr. M.D.Tenn.1986) (negligent dental treatment).

the commencement of the case and therefore, was subject to the automatic stay. *See A.H. Robins*, 839 F.2d at 203. Critical to the court's ruling was the fact that the Dalkon Shield was *"inserted in the claimant prior to the time of filing of the petition." Id.* at 203 (emphasis added).

*Waterman*, another leading Conduct Test case, involved a class of employees who had been exposed to asbestos prepetition but did not manifest asbestos-related diseases until postpetition. In that situation, the court ruled that the employees held § 101(5) claims. *See Waterman*, 141 B.R. at 556. It specifically held that "the claims arose at the moment the Asbestosis Claimants *came into contact with the asbestos." Id.* at 556 (emphasis added).

It is significant that in neither case did the court find the manufacture, sale or distribution of the defective product to be the triggering conduct that gave rise to the liability. Rather, the critical act was the claimant's prepetition *contact* with the defective product.

Distilled to their most crucial aspects, the Conduct Test cases each involved: (1) a wrongful prepetition act by the debtor; (2) the future claimant was exposed to or came into contact with the defective product prepetition; and (3) as a result, the future claimant manifested an injury postpetition. The only event remaining after the filing of the petition was the *manifestation* of the prepetition injury. All other relevant events—the debtor's wrongful conduct, the claimant's exposure to the wrongful conduct, the sustaining of an injury or harm—occurred prior to

the filing of the petition. Under these circumstances, the courts hold that for bankruptcy purposes, the claim will be deemed to arise prior to the commencement of the case.[5]

■ None of these aspects exists in this case. In contrast to *A.H. Robins* and *Waterman*, there is no evidence in the record in this case of a known defective or harmful product. There is not (and never will be) even a prepetition exposure to or contact with an allegedly defective Piper product as to some of the Future Claimants. Indeed, some of the Future Claimants are not even born. Even in those situations where there is a prepetition exposure or contact, that alone does not give rise to a "right to payment" if the exposure or contact did not result in some prepetition injury. Significantly, the claimants in *A.H. Robins* and *Waterman* already had sustained an injury prepetition that later manifested into symptoms postpetition. There is absolutely no evidence in the record, nor can the Court conceive of circumstances wherein a prepetition exposure to an allegedly defective Piper aircraft or parts will result in a prepetition injury that does not manifest itself until postpetition. In short, this case is "the extreme case of prepetition conduct that has [not] yet resulted in any tortious consequence to a victim." *Chateaugay*, 944 F.2d at 1004.[6]

These critical distinguishing factors render the Conduct Test inapplicable to the specific facts presented in the case at bar. This does not necessarily exclude the application of the test in other cases involving different circumstances. The Court merely agrees with the

---

**5.** Referring to the mass tort cases, one court observed the following:

Accordingly, in case of pre-petition exposure to harmful chemicals, drugs, materials or inter-uterine devices, the bankruptcy courts will presume that a bodily injury was sustained at the time of the exposure to the defective product. For bankruptcy purposes, the claim will be deemed to arise at that time, regardless of whether the injury remains latent and does not manifest itself until after the case is commenced.

*In re Pettibone Corp.*, 90 B.R. 918, 932 (Bankr. N.D.Ill.1988). Unlike the mass tort asbestos and Dalkon Shield cases, this case does not involve an inherently harmful or dangerous product.

The record is devoid of any evidence that a bodily injury is sustained at the time of the exposure to an allegedly defective Piper aircraft. In fact, it is quite conceivable that one can be exposed to a defective Piper product and suffer absolutely no harm or injuries therefrom.

**6.** The Court does not intend to suggest that for there to be a "claim," the tortious consequence must be such as would be required to sustain a cause of action under state law. That position would be a return to the accrued state law theory under *Frenville, supra,* which this Court rejects. Rather, it seems that *some* prepetition tortious consequence is essential for a "claim" to exist under the Code.

Bankruptcy Court's rejection of the application of a Conduct Test that would give rise to "claims" "*simply because* the design and manufacture of products occurred prepetition." *Piper*, 162 B.R. at 625 (emphasis added). *See also, Pettibone*, 90 B.R. at 932 ("The mere manufacture and sale of a defective product ... does not give rise to liability to the person injured postpetition; standing alone, that act does not give rise to liability to that ultimately injured person"); *Chateaugay*, 944 F.2d at 1003 ("Defining claims to include any ultimate right to payment arising from pre-petition conduct by the debtor ... yields questionable results").[7]

■ Rather, for a "claim" to exist, there must be some way to connect the future claims to the debtor today, *see Piper*, 162 B.R. at 627, such that it can be fairly said that Piper's obligations to the Future Claimants are sufficiently rooted in the present. *See In re UNR Industries, Inc.*, 20 F.3d 766 (7th Cir.1994) ("Bankruptcy separates the past and future of an enterprise, satisfying claims attributable to yesterday's activities out of existing assets ..."). In that regard, the Bankruptcy Court properly required more than a prepetition conduct by Piper. It

determined that some "prepetition relationship" between the debtor and the future claimants must exist in order for a future claimant to have a "claim" under the Code.[8]

■ Several courts have adopted the Prepetition Relationship Test as the more appropriate theory to follow in determining whether a "claim" exists for bankruptcy purposes.[9] The Court notes that the Prepetition Relationship Test and the Conduct Test are not mutually exclusive. As observed by the Bankruptcy Court, the Conduct Test cases presume not only that there was some prepetition conduct, but also that there was some prepetition relationship between the debtor's conduct and the claimant. *See Piper*, 162 B.R. at 627. Likewise, under the Prepetition Relationship Test, there must first be some prepetition conduct that gives rise to a prepetition relationship.

The Bankruptcy Court provided four examples of a prepetition relationship, namely "contact, exposure, impact, or privity, between the debtor's prepetition conduct and the claimant."[10] *Piper*, 162 B.R. at 627. It, however, did not actually define the phrase "prepetition relationship,"[11] and it is this

7. The Court's independent research has not revealed a case wherein a "right to payment" under § 101(5) was found to exist based solely on the mere possibility that harm or injuries may occur postpetition as a result of the debtor's prepetition wrongful conduct.

8. *See also, In re Correct Manufacturing Corp.*, 167 B.R. 458 (Bankr.S.D.Ohio 1994) ("Even if the earliest point of contact ... is adopted as the analytical framework for determining when a claim arises, some prepetition connection between the debtor and the 'claimant' is essential").

9. *See Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir.1994) (following *Piper*); *In re Jensen*, 995 F.2d 925, 930–32 (9th Cir.1993) (a prepetition relationship between the claimant and the debtor must exist for a "claim" to arise under the Code); *Chateaugay*, 944 F.2d at 1005 (the "relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims' "); *Pettibone*, 90 B.R. at 931–33 (plaintiff did not have a "claim" as of the petition date for his post-petition injury resulting from operating a forklift where there was no

prepetition relationship or exposure to tie the claimant to the debtor).

10. The Bankruptcy Court clarified that not every prepetition relationship will give rise to a claim, but that a prepetition relationship is a threshold requirement for a claim. *Piper*, 162 B.R. at 627. This Court agrees. The determination of whether a certain prepetition relationship (once it is deemed to exist) is sufficient to sustain a § 101(5) claim would depend on the particular facts surrounding the relationship.

11. The Court does not criticize the Bankruptcy Court in this regard. This Court is of the opinion that the legislature, rather than the judiciary, is the more appropriate and better equipped body to determine the highly complex issue of whether future claimants hold "claims" under the Code. Given the extreme importance of the fundamental concept of a "claim" in bankruptcy matters, the resolution of this issue can relate to and affect a wide variety of industries and different causes of actions. Accordingly, legislative hearings by the drafters of the Code could be held to explore in full all matters and concerns connected with the task of determining and clarifying the meaning of the term "claim" as it relates, if at all, to future claimants and their interests in bankruptcy proceedings. Under the circum-

Court's view that the examples specified are by no means an exhaustive list of the circumstances in which a prepetition relationship may arise. Clearly, the outer limits of the phrase "prepetition relationship" remain undetermined. For example, does a prepetition purchase of a defective Piper aircraft that crashes and causes injuries postpetition create a "prepetition relationship" sufficient to make out a "claim" under § 101(5)?

■ Notwithstanding the lack of a definition, the lower court's analysis and reasoning that resulted in the application of the "prepetition relationship" test is sound and is adopted by this Court. Where, as here, there is no known defective product, no known prepetition exposure, contact or impact and no known prepetition injury, the circumstances simply are too attenuated to find a prepetition relationship between Piper and the Future Claimants so as to obligate Piper today to satisfy potential future claims out of existing assets. Moreover, as the court in *Chateaugay* stated, "[t]o expect 'claims' to be filed by those who have not yet had any contact whatever with the tort-feasor has been characterized as 'absurd.'" *Chateaugay*, 944 F.2d at 1003.

Based upon the foregoing, the Court accepts and affirms the Bankruptcy Court's decision that the Future Claimants do not hold § 101(5) claims against Piper under the specific facts of this case.

## C. POLICY CONSIDERATIONS

■ One of the basic policies of the Bankruptcy Code is the equal treatment of similarly situated creditors. *See In re PCH Associates*, 949 F.2d 585, 598 (2d Cir.1991); *In re Julien Co.*, 157 B.R. 834, 836 (Bankr. W.D.Tenn.1993); *In re 222 Liberty Associ-*

*ates*, 108 B.R. 971, 990 (Bankr.E.D.Pa.1990). The Legal Representative argues that his constituents, the Future Claimants, are similarly situated to the unsecured creditors represented by the Appellee, and therefore, ought to receive the same treatment.

The Court does not agree that these groups are similarly situated. At the time of its bankruptcy filing, Piper owed legal obligations to the unsecured creditors. That group had a "right to payment" from Piper. In contrast, the Future Claimants do not have a right to payment because Piper owed no legal obligations to them at the time of its filing.

The Court also cannot say that recognizing the Future Claimants' "claim" will aid in an effective reorganization of Piper. In fact, recognizing "claims" of unidentified and unidentifiable future claimants who have suffered absolutely no injuries prepetition, some of whom are yet unborn and who by definition can have no prepetition contact with Piper, would likely create very real and formidable practical and logistical problems such as, but not limited to, providing adequate notice of the proceedings to the potential victims.[12]

From a practical and pragmatic viewpoint, and in furtherance of the cornerstone fresh start theory of bankruptcy law, the Court finds that the prepetition relationship test as applied by the Bankruptcy Court is the best means to accomplish the objectives of the Bankruptcy Code under the specific circumstances that exist in this case. The Court appreciates the natural tendency to be sympathetic to any injury that may occur in the future. However, this natural tendency can not be controlling as to the issue at bar as a matter of law.[13]

---

stances that exist in this case at present, the Court is limiting its straight yes or no answer to the issue at bar without the benefit of hearings to fully explore all possibilities.

**12.** While this potential procedural due process problem theoretically could be overcome by the appointment of a legal representative, it remains a real factor in this case since, as the Appellee and Piper point out, the Legal Representative takes the position that he, on behalf of the Future Claimants, has not consented to the jurisdiction of the Bankruptcy Court.

**13.** The Court rejects the Legal Representative's contention that the Future Claimants will be without a legal remedy if their "claims" are not recognized and dealt with in this bankruptcy proceeding. Without determining the issue, it is possible that the Future Claimants may have a non-bankruptcy future remedy from insurance companies, intermediaries, component parts manufacturers, the successor to Piper, the successor to Piper's assets and others.

*Conclusion*

For the foregoing reasons, the Court hereby AFFIRMS the Order Sustaining Objection to Claim and Disallowing Legal Representative's Proof of Claim, entered on December 6, 1993 by the United States Bankruptcy Court for the Southern District of Florida and ACCEPTS and AFFIRMS the Bankruptcy Court's Memorandum Opinion, reported at 162 B.R. 619, as and in the manner herein set forth.

DONE AND ORDERED.