### In re PIPER AIRCRAFT CORPORATION, Debtor.

### PIPER AIRCRAFT CORPORATION and Official Committee of Unsecured Creditors, Plaintiffs,

### v.

### Lori CALABRO, as Executrix of the Estates of Frank Calabro and Ruth Calabro, Defendant.

### Bankruptcy No. 91–31884–BKC–RAM. Adv. No. 93–1428–BKC–RAM–A.

United States Bankruptcy Court, S.D. Florida.

July 14, 1994.

---

Jonathan C. Scott, Burton, Scott & Associates, P.C., Melville, NY, for Calabro.

Paul S. Singerman, Stroock, Stroock & Lavan, Miami, FL, for debtor.

Howard J. Berlin, Kluger, Peretz, Kaplan & Berlin, P.A., Miami, FL, for Creditors' Committee.

David G. Epstein, Paul K. Ferdinands, King & Spalding, Atlanta, GA, Legal Representative for Future Claimants.

## MEMORANDUM OPINION IN SUPPORT OF ORDER VACATING PARTIAL SUMMARY JUDGMENT

ROBERT A. MARK, Bankruptcy Judge.

In an earlier opinion [1] this Court held that future potential claimants who may assert postconfirmation claims related to aircraft manufactured prepetition by Piper Aircraft Corporation ("Piper" or "Debtor") do not hold "claims" under § 101(5) of the Bankruptcy Code (the "Code"). In this adversary proceeding, the Court must decide a related issue—does a party injured postpetition but preconfirmation from the crash of a plane built prepetition hold a § 101(5) claim? If so, does the claim arise prepetition such that the state law action filed against the Debtor postpetition is subject to the automatic stay?

### FACTUAL AND PROCEDURAL BACKGROUND

On July 1, 1991, (the "Filing Date") Piper filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. About three weeks after the Filing Date, on July 26, 1991, Ruth and Frank Calabro, the parents of Lori Calabro, were killed in the crash of a Piper Aztec airplane built in 1975. The plane was designed, manufactured and sold prior to the Filing Date. Both decedents were residents of the State of New York, County of Suffolk.

Nearly two (2) years later, on July 21, 1993, Lori Calabro, as Executrix of the Estates of Frank and Ruth Calabro, ("Calabro") commenced an action in the Supreme Court of the State of New York, County of Suffolk (the "New York Action"), seeking $150 million in compensatory damages and $100 million in punitive damages against Piper, based upon alleged design defects and failure to warn of the alleged known dangers.

On July 27, 1993, Debtor filed a suggestion of bankruptcy in the Supreme Court of the

---

1. *In re Piper Aircraft Corp.,* 162 B.R. 619 (Bankr. S.D.Fla.1994) (the "Future Claims Opinion") aff'd *Epstein v. The Official Cmte. of Unsecured* *Creditors of Piper Aircraft Corp. (In re Piper Aircraft Corp.),* 168 B.R. 434 (S.D.Fla.1994) (the "District Court Future Claims Opinion").

State of New York, contending that the commencement and continuation of the action was subject to the automatic stay in § 362 of the Bankruptcy Code. Counsel for Calabro believed that the action was not stayed and advised Piper that he intended to proceed.

On August 27, 1993, Piper was allegedly served with another copy of the summons and complaint at its office in Vero Beach, Florida. Piper contests the sufficiency of service. That issue is not before this Court.

Piper did not respond to the complaint and on November 10, 1993, Justice Cohalan of the Supreme Court of the State of New York entered a default judgment against Piper. The New York court set a hearing for December 21, 1993, to determine the damages to be awarded to Calabro. The order setting the Inquest hearing on damages was served on Piper on December 11, 1993, which triggered the filing of this adversary proceeding on December 20, 1993. Piper's adversary complaint was accompanied by an emergency application for an order enjoining prosecution of the New York Action.

The Complaint alleges that the state law tort claims in the New York Action are prepetition claims which are stayed by § 362. The debtor prayed for a declaratory judgment declaring the state court action and the orders entered by the court there to be void. It further prayed in Count II for a permanent injunction against the prosecution of these claims, asserting that they were subject to administration under the Bankruptcy Code as prepetition unsecured claims and that continuation of the New York Action would cause irreparable harm.

On December 20, 1994, Chief Bankruptcy Judge Cristol of this Court conducted an emergency hearing and granted preliminary injunctive relief. Calabro's motion for rehearing was argued on January 4, 1994, resulting in the entry that day of this Court's Amended Order Granting Emergency Motion for Preliminary Injunction (the "Preliminary Injunction"). The Preliminary Injunction enjoined Calabro from prosecuting the New York Action pending final adjudication of this adversary or further Order of this Court. The Court did not rule in that order on whether Calabro's claims constitute

"claims" under § 101(5) of the Bankruptcy Code or whether the claims are subject to the automatic stay. Instead, noting that there have been in excess of 200 incidents involving postpetition crashes of planes built prepetition, the Court found that it was essential to the Debtor's reorganization for this Court to retain control over all claims arising from these incidents since they will be treated under the Debtor's plan.

Piper has filed a liquidating plan of reorganization (the "Plan") which contemplates the sale of substantially all of Piper's assets. The Plan provides the same treatment for all preconfirmation crash claims, whether the incidents occurred before or after the Filing Date. Piper has also sought and obtained an order fixing a supplemental bar date requiring the filing of claims by all persons claiming damages arising out of preconfirmation accidents involving planes or parts manufactured or sold by Piper. This procedure is intended to provide the Debtor with additional information on the number and scope of claims arising from postpetition incidents.

### The Summary Judgment and Motion to Vacate

On April 15, 1994, the Court entered its Order Granting Partial Summary Judgment in favor of Calabro (the "Summary Judgment Order"). For the reasons set forth in the findings and conclusions announced on the record on April 8, 1994 (the "April 8th Findings"), the Court found that the claim, if any, by Calabro against the Debtor did not arise prior to the Filing Date. The Court held that Calabro's claims were not "claims" as defined in § 101(5) of the Bankruptcy Code and that her pursuit of these claims in the New York Action was not stayed by § 362 of the Bankruptcy Code.

In conjunction with granting partial summary judgment, the Court continued the Preliminary Injunction with one modification. The injunction was lifted for the sole purpose of requiring Piper to file, and allowing the New York court to hear and adjudicate, a motion to vacate or set aside the November 10, 1993 default in the New York Action. This modification was incorporated in this

Court's April 8, 1994, Order Modifying Injunction. On June 23, 1994, the New York Court issued an order denying Piper's motion to vacate.[2]

After the Court entered its Summary Judgment Order and in preparation for the May 7, 1994 hearing on Piper's disclosure statement, the Debtor and the Committee reached the conclusion that Calabro and others similarly situated could *not* be treated in and bound by the Plan unless they held § 101(5) claims arising prior to the Filing Date. This statutory outcome was not argued to the Court prior to entry of the April 8th Findings and if argued, would have been material to the Court's conclusion. When this problem was presented at the disclosure hearing, the Court advised the parties that it would not confirm a plan that did not treat Calabro and other post petition incident claimants as Piper had always intended. Convinced that Calabro had to hold a claim in order to be treated, the Debtor, on May 27, 1994, filed Piper's Motion to Vacate the Order Granting Partial Summary Judgment ("Motion to Vacate").

The Debtor, the Committee, Calabro and David Epstein, Legal Representative for the Future Claimants[3], all submitted memoranda on the Motion to Vacate and the parties presented lengthy and helpful oral argument on June 10, 1994. Following thorough review of the facts and reconsideration of the law, the Court concludes that its earlier analysis was *incomplete resulting in the wrong legal conclusion*. The only result consistent with bankruptcy policy and the compelling facts of this case is to find that Calabro has a "claim" defined in § 101(5) of the Code that arose before the filing of this case.

**2.** The New York Court's June 23 Order was not seen by or known of by this Court until it was attached to a pleading filed on June 29. By that date, the Court had reached its decision on the Motion to Vacate and was in the revision process of this opinion. Therefore, while this opinion is being issued after the New York Court's ruling, that ruling did not affect this decision.

**3.** This Court's May 19, 1993 Order appointing the Legal Representative specifically defines "Future Claimants" to include: All persons, whether known or unknown, born or unborn, who may

The applicable Code provisions may not fit perfectly but treating Calabro as a "creditor" is the right result. She, like most postpetition claimants, has no basis to assert an administrative expense claim under § 503 if her claims arise from the prepetition design, production and sale of a Piper aircraft. Rather, Calabro should be treated under the Plan just like prepetition incident claimants who assert similar product liability theories. This requirement for similar treatment frames the problem. Unless Calabro is a "creditor" as defined in § 101(10) with a "claim" as defined in § 101(5) that arose before the Filing Date, it is not possible to treat her under a plan and bind her by a plan. That result is unacceptable and illogical. Since her claim can and must be treated in the plan, Calabro must be treated as a "creditor." Accordingly, the prior summary judgment in favor of Calabro will be vacated and summary judgment will be entered in favor of the Debtor.

### *DISCUSSION*

### I.

### *This Court has the Authority to Reconsider Its Prior Order*

The applicable rules authorize the Court to reconsider its prior ruling granting partial summary judgment. Under Rule 54(b), Fed.R.Civ.P., incorporated into bankruptcy proceedings by Fed.R.Bankr.P. 7054, the Court may reverse a prior interlocutory order at any time before the order becomes final. *See Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167, 185 (5th Cir.1990); *Xerox v. Genmoora,* 888 F.2d 345, 355 (5th Cir.1989). Rule 54(b) provides in pertinent part as follows:

after the date of confirmation of Piper's Chapter 11 plan of reorganization assert a claim or claims for personal injury, property damage, wrongful death, damages, contribution and/or indemnification based in whole or in part upon events occurring or arising after the Confirmation Date, including claims based on the law of product liability, against Piper or its successor arising out of or relating to aircraft or parts manufactured and sold, designed, distributed or supported by Piper prior to the Confirmation Date.

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon a determination that there is no just reason for delay and upon express direction of a judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all of the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

Fed.R.Civ.P. 54(b) (emphasis added).

The Summary Judgment Order is an interlocutory order because it did not resolve all issues in this adversary. In fact, it did not resolve a key issue in Count I of the Debtor's complaint: whether and how Calabro should be treated in the Plan. In its order, the Court specifically left open the question presented by section i(b) of Count I, namely, whether Calabro was subject to administration under the Plan. At the time of the ruling, the Court and the Debtor believed that Calabro could be treated under the Plan even if she did not hold a § 101(5) claim. In fact, the Court acknowledged that "[i]t may prove to be both logical and fair to treat postpetition accident victims the same as prepetition victims where the accidents involved planes that were built prepetition." April 8th Findings, p. 15. Without the plan treatment issue being argued, the Court's Summary Judgment Order rested on a faulty assumption, namely, that the logical and fair result could be reached without treating Calabro as the holder of a § 101(5) claim. Thus, the Court finds it necessary and permissible to reconsider the motion for summary judgment.

█ Even if Rule 54(b) did not apply, Fed. R.Civ.P. 60(b)(6), incorporated into bankruptcy proceedings by Fed.R.Bankr.P. 9024, authorizes the Court to reverse its prior order. Under Rule 60(b)(6), the Court may reverse a final judgment where (i) there are unusual and extreme circumstances mandating relief, *see Olle v. Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir.1990); and (ii) the motion for relief is filed within a reasonable time, which ordinarily depends on the length and circumstances of the delay, the prejudice to the opposing party by reason of the delay, and the circumstances compelling equitable relief. *See In re Emergency Beacon Corp.,* 666 F.2d 754, 760 (2d Cir.1981) (holding that trustee's motion to vacate order authorizing debtor in possession to issue certificates of indebtedness filed twenty-six months after entrance of order was filed within a reasonable time); *In re Pacific Far East Lines,* 889 F.2d 242, 249 (9th Cir.1989) (eighteen months not untimely nor unreasonable under the circumstances).

█ The unusual circumstances here warrant relief from the prior order and the Debtor filed the motion within a reasonable time, thus satisfying the requirements for relief under Rule 60(b). The Debtor announced its intention to seek relief from the order at the May 7 disclosure statement hearing, within forty days of the Court's oral ruling and soon after it became aware of the difficulty, if not impossibility, of treating Calabro under its Plan as a result of the partial summary judgment. The Debtor filed its Motion to Vacate shortly after the continued disclosure hearing on May 19. Thus, under both Rule 7054 and 7060, the Court has the authority to consider the Motion to Vacate.

## II.

***The New York Action is a Proceeding to Recover a "Claim" as Defined in § 101(5) of the Bankruptcy Code and is Subject to the Automatic Stay***

Piper argues that the New York Action is subject to the stay provisions of both § 362(a)(1) and § 362(a)(3). The § 362(a)(3) argument may be disposed of without lengthy discussion. That section operates as a stay of "any act to obtain possession of property of the estate or of property from

the estate or to exercise control over property of the estate."

■ Calabro is seeking to liquidate the amount of her claim, not to execute against assets of the Debtor. As such, prosecution of the New York Action is not "an act to obtain possession of property of the estate ... or to exercise control over property of the estate" subject to the stay provisions of § 362(a)(3). To the extent that *In re Federal Press Co.*, 117 B.R. 942 (Bankr.N.D.Ind.1989) held that § 362(a)(3) does apply to these types of claims, this Court declines to follow that holding.

Debtor's primary argument is that the New York Action is stayed by § 362(a)(1). Since the New York Action was not an action that "could have been commenced before the commencement of the case" the only issue is whether the New York Action is an action "to recover a claim against the debtor that arose before the commencement of the case ..." For § 362(a)(1) to be applicable, the Court must find that Calabro's claim for damages resulting from a postpetition crash is a § 101(5) claim that arose or is deemed to have arisen before the Filing Date.

Piper urges the Court to accept the following standard: Debtor's prepetition conduct plus claimant's preconfirmation injury establishes a § 101(5) claim. In this case, Piper's prepetition conduct was its manufacture and sale of an allegedly defective plane; Calabro's preconfirmation injury occurred as a result of the crash of that plane. Since the claim is based on the Debtor's prepetition conduct, Piper argues that the claim "arose" before the Filing Date.

In its April 8th Findings, the Court rejected the Debtor's proposed standard finding instead that the "claim" determination must be made by viewing the events as of the Filing Date without regard to postpetition events. Viewed as of the Filing Date, the Court concluded that Calabro had no different relationship with Piper than the Future Claimants. As of the Filing Date, Calabro was no more identifiable than the Future Claimants.

Upon further consideration, the Court concludes that nothing in the Code's definition of a claim precludes the Court from looking at postpetition events in determining whether a claim exists. Moreover, if postpetition events can give rise to a § 101(5) claim which can and should be treated in a Chapter 11 plan, the nature of that claim, that is, whether it is a claim that arose prior to the Filing Date, should be determined by looking at the underlying nature of the claim. Utilizing this methodology, Calabro holds a § 101(5) claim. Since her claim is based upon the prepetition conduct of the Debtor, it is a claim that arose or is deemed to have arisen at or prior to the Filing Date, subject to the automatic stay.

### A. Statutory Analysis

### 1. Unlike the Future Claimants, Calabro holds a § 101(5) claim

Section 101 of the Code defines claim in pertinent part as follows:

(5) "claim means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured;"

■ Congress intended the broadest possible definition of claim when it enacted the Code. *See* Future Claims Opinion, 162 B.R. at 619, and cases cited therein. As reflected in the legislative history, "the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, *will be able to be dealt with in the bankruptcy case.*" H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5963, 6266 (emphasis added).

In the Future Claims Opinion, the Legal Representative urged the Court to apply the so-called "conduct test" utilized in certain mass tort cases [4] and to find that the Future

---

4. *See e.g. In re A.H. Robbins, Co.*, 63 B.R. 986 (Bankr.E.D.Va.1986), *aff'd sub nom. Grady v. A.H. Robins Co.*, 839 F.2d 198 (4th Cir.), *cert. dismissed* 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988) (claim for injuries arising from prepetition sale and insertion of Dalkon Shield birth control device); *Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.)*, 141 B.R. 552, 556 (Bankr.S.D.N.Y.1992) (asbestosis claims of former employees "arise at the moment

Claimants hold "claims" since Piper's conduct, namely the design and manufacture of the planes, occurred prepetition.

In rejecting the Legal Representative's argument, the Court found that the "conduct test" applied in those cases was inadequate, standing alone, to analyze whether Piper's Future Claimants hold "claims." The Court found it significant that there is "no way to identify a discrete class of individuals who will have claims arising out of prepetition conduct." 162 B.R. at 627. Moreover, "unlike the asbestos and Dalkon Shield cases, the Legal Representative cannot pinpoint which aircraft or parts are defective." 162 B.R. at 625. With no identifiable group of claimants and no identifiable defective product, the Court concluded that the future claims of the Future Claimants class failed even the broadest reasonable test for recognition of a "claim." 162 B.R. at 628. The Future Claims Opinion was affirmed by District Judge Aronovitz in the District Court Future Claims Opinion.

■ Calabro and the other postpetition claimants are different. They and the specific Piper planes have now been identified. The connection between the Debtor's manufacture of the plane in which her parents crashed and the injury suffered by her parents is now known.

The Future Claims Opinion left open the nature and treatment of postpetition preconfirmation claims, 162 B.R. at 629 n. 7, but the distinction between holders of these claims and the Future Claimants was noted in the Smith and Jones hypothetical framed by the Court:

> Should crash victim Jones be able to share in plan distributions if his plane crashes preconfirmation, while crash victim Smith receives nothing under the plan if his plane crashes postconfirmation?
>
> The Court concludes that the answer is yes, their treatment can and should be different. In bankruptcy, as in life, timing matters. There is a major distinction between Jones and Smith. Jones can be identified presently; Smith cannot. Only future events, impossible to predict at the time of confirmation of a plan, will determine who the future claimants will be, and whether Smith in fact will be one of them. *Were Smith and his fellow claimants presently ascertainable and identifiable, the answer might be different;* but in the instant case it is impossible to determine who ultimately will belong to the class of creditors, and whether any prepetition relationship to the Debtor gives rise to their potential future causes of action.

162 B.R. at 628–629 (emphasis added). Calabro, like Jones in the hypothetical, can and should be treated differently than the Future Claimants.

The Court's conclusion that Calabro has a claim does not change its conclusion that the Future Claimants do not. However, the Motion to Vacate has caused the Court to revisit portions of the analysis in the Future Claims Opinion and to revisit the "test" suggested in that opinion and in the District Court Future Claims Opinion.

■ The District Court Future Claims Opinion described the relationship test as requiring "some prepetition injury" or "some prepetition tortious consequence." If there is a narrow focus on only these types of events, Calabro would not hold a claim since clearly, her parents had not suffered any "injury" or "tortious consequence" as of the Filing Date. A focus on prepetition events was useful to distinguish Piper's Future Claimants from the asbestos and Dalkon Shield future claimants, all of whom were exposed to a known dangerous product before the petition date. In that context, the Court simply did not address the significance of postpetition, preconfirmation events. This time period was not relevant to the specific issue since, by definition, the Future Claimants' injuries will result from postconfirmation events. Having now considered the significance of postpetition preconfirmation

---

when acts giving rise to the alleged liability are performed"), *vacated on other grounds,* 157 B.R. 220 (S.D.N.Y.1993). *See also Roach v. Edge (In re Edge),* 60 B.R. 690, 705 (Bankr.M.D.Tenn. 1986) (applying the conduct test to find that former patient's claim, based on alleged prepetition negligent treatment arose at the time of the prepetition misconduct, even though the injury was not discovered until postpetition.)

events in this case, the Court concludes that focusing solely on events as of the Filing Date is not compelled by any language in § 101(5) and was not necessary for the result reached in the Future Claims Opinion.

In its Future Claims Opinion, the Court stated: "Since there is no way to connect the future claims to some *prepetition relationship*, there is also no way to identify a discrete class of individuals who will have claims arising out of prepetition conduct." 162 B.R. at 627 (emphasis added). The Future Claims result would have been the same if this statement had been worded slightly differently: Since there is no way, *prior to confirmation*, to connect the future claims to some *prepetition conduct*, there is no way to identify a discrete class of individuals who will have claims arising out of the Debtor's prepetition conduct. *See Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277 (5th Cir.1994) (§ 101(5) claim requires that "at a minimum, there must be evidence that would permit the debtor to identify, *during the course of the bankruptcy proceeding*, potential victims.") (emphasis added).

■ This modified analysis still requires a relationship between the Debtor's conduct and the claim. It simply changes the focal point for determining the sufficiency of the relationship from the petition date to the confirmation date. This focal point is consistent with the Code's intent to consider postpetition events in determining who should be treated in a plan, as discussed more fully later in this opinion. This focal point also provides consistent and equitable treatment for Calabro and the other postpetition accident claimants in this case.[5]

Analyzing the "claim" issue in this case has demonstrated the difficulty of articulating a precise test applicable to the vast landscape of rights and interests which may be within the scope of treatment in a plan of reorganization. Nevertheless, with the added benefit of the analysis engendered by the Motion to Vacate, the Court will offer a modified "test" that fits, (perhaps not snugly), both the Future Claimants and Calabro.

■ The suggested test is as follows: an individual has a § 101(5) claim against a debtor manufacturer if (i) events occurring before confirmation create a "relationship" between the claimant and the debtor's product; and (ii) the basis for liability is the debtor's prepetition conduct in designing, manufacturing and selling the allegedly defective or dangerous product. This test still focuses on the Debtor's prepetition conduct. That conduct only gives rise to a "claim" to be administered in the case if there is a relationship established before confirmation between an identifiable claimant or group of claimants and that prepetition conduct. That relationship is established for Calabro; it is not for the Future Claimants. Calabro holds a § 101(5) claim.

### 2. Calabro's § 101(5) Claim Arises or is Deemed to Arise Prepetition

#### a. *Absent Proof of a Postpetition Failure to Warn, Calabro Has No Basis to Claim an Administrative Expense.*

■ Calabro's complaint in the New York Action[6] asserts theories of liability based almost exclusively on Piper's prepetition conduct. The Complaint names Piper Aircraft Corporation as the defendant. It was never amended to name Piper, as debtor-in-possession. The only paragraph in the Complaint alleging wrongful conduct extending beyond the Filing Date is paragraph 23 which alleges, without time reference, a failure to correct defects and a failure to warn pilots of the alleged risk of fuel contamination. The

---

5. The court in *In re Correct Manufacturing*, 167 B.R. 458 (Bankr.S.D.Ohio 1994) held that a postpetition accident victim in a Chapter 7 case did not hold a claim. The Court cited the Future Claims Opinion in support of its statement that "there would need to be *prepetition events* directly linking this Debtor to this claimant" for the party to hold a "claim" 167 B.R. at 459 (emphasis added). The Court's conclusion here that postpetition, preconfirmation events can provide the link would not change the result in the Fu-

ture Claims Opinion but is obviously at odds with the court's focus and conclusion in *Correct Manufacturing*.

6. A copy of the complaint is attached as an exhibit to Calabro's June 7, 1994 Memorandum in Opposition to the Motion to Vacate and was referred to, without objection, during the June 10th oral argument on the Motion to Vacate.

remaining factual allegations all relate to prepetition conduct including the sale of the plane (Paragraph 25); defective design at time of sale (Paragraph 26); negligence in the manufacture and sale (Paragraph 27); and breach of express and implied warranty at time of sale (Paragraphs 35 and 36). Given the nature of the claim, the fact that the accident occurred postpetition does not mean that the claim, if allowed, would be entitled to treatment as an administrative expense under § 503(b) of the Code. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir.1976); *In re Pettibone Corp.*, 90 B.R. 918 (Bankr. N.D.Ill.1988).

Section 503 defines administrative expenses as including "the actual necessary costs and expenses of preserving the estate." § 503(b)(1)(A). Section 503 priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors. *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1377 (11th Cir. 1994).

In the context of tort claims, administrative priority is only available when the debtor-in-possession's actions give rise to liability. *In re Pettibone*, 90 B.R. at 933. As formulated by the Seventh Circuit, a claim will be afforded administrative priority if (1) the debt arises from a transaction with the debtor-in-possession; and (2) that transaction benefitted the debtor-in-possession in the operation of its postpetition business. *Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984); *Seidle v. United States (In re Airlift )*, 97 B.R. 664, 668 (Bankr.S.D.Fla. 1989).

If Calabro can prevail in proving a postpetition failure to warn, damages awarded on that theory would be entitled to administrative expense priority since the debtor-in-possession would be the tortfeasor. If, on the other hand, Calabro can only establish liability based on the Debtor's prepetition design and manufacture of the aircraft, there is no basis for treating the claim as an administrative expense. That result follows because the actionable conduct was by the prepetition debtor and provided no benefit to the debtor-in-possession during the adminis-

tration of the case. *Pettibone,* 90 B.R. at 934.

In sum, to the extent that Calabro establishes liability based upon a postpetition failure to warn by the debtor-in-possession, Calabro will be entitled to payment of an administrative expense under § 503(b). However, since all other theories of liability are based upon Piper's prepetition conduct, any liability on these theories would not be linked in any way to the debtor-in-possession and would therefore not be treated as an administrative expense.

**b.** ***Although the Accident Occurred Postpetition, Calabro's Claim Arose or is Deemed to Have Arisen Before the Filing Date.***

Having established that Calabro has a "claim" and that her claim, if allowed, would not be entitled to treatment as an administrative expense, one issue remains: When did her claim "arise"? The Code may lack specific statutory guidance but the structure and intent of the Code supports the logical result—Calabro's claim "arose" or is deemed to have "arisen" before the Filing Date. The statutory analysis follows.

Under § 1141(a), only a "creditor" is bound by the plan. A creditor, under § 101(10), includes those claims that arise at or before the filing date and those specific statutory claimants whose claims may arise from postpetition incidents but are deemed to be claims arising at or before the filing date. Calabro concedes that she may have a claim but argues that she is not a creditor who can be bound by a plan because her claim, in her view, arose after the Filing Date.

Calabro's argument ignores the structure and purpose of the Code. The Code contemplates treatment for all parties who have rights to seek payment from the Debtor as a result of any events occurring preconfirmation. Either one has a right to treatment as an administrative expense, if the events giving rise to the claim involved postpetition conduct by the debtor-in-possession or one holds a "claim" arising or deemed to arise before the filing of the petition, if the

claim is tied to prepetition conduct of the debtor. There is no in between. Thus, the Court rejects Calabro's argument that she may hold a "claim" but is not a "creditor".

Furthermore, various Code provisions reveal the intent of Congress to treat certain claims arising from postpetition, preconfirmation events as if they had arisen before the filing of the bankruptcy petition. Specifically, reimbursement and contribution claims in § 502(e)(2), "gap" claims in involuntary cases in § 502(f), executory contract rejection claims in § 502(g), claims arising from the postpetition recovery of property in § 502(h) and certain tax claims in § 502(i) are all deemed under the Code to be treated as if they arose at or before the order for relief. Section 348(d) also provides for postpetition claims to be treated as if they arose before the filing date in cases converted to Chapter 7.

■ There is no specific statutory provision in § 502 or elsewhere in the Code that deems postpetition tort claims to be treated as if they arose before the filing. Nevertheless, these provisions reflect the Code's recognition of circumstances in which postpetition events may be considered in determining the existence of a "claim." Since § 101(5) does not, on its face, preclude the Court from looking at postpetition events, the Court has reconsidered its earlier view that the particular postpetition situations described in § 502 are exhaustive. Instead, the Court finds that other postpetition events, specifically the postpetition crashes of Piper's prepetition planes, also give rise to claims that arise or are deemed to have arisen before the Filing Date.

■ It is not only logical, but also consistent with the structure of the Code for all "claims" to either arise or be deemed as arising before the Filing Date. This is so because the concept of "claim" is tied to a debtor's prepetition conduct as distinct from an administrative expense which is tied to postpetition conduct. Stated another way, it would be illogical to have a § 101(5) claim that is treated as arising after the filing of a

case since such a right to payment, by definition, would be against the debtor-in-possession and therefore an administrative expense, not a "claim."

■ The language of § 362(a)(1) also indicates an intention to apply a broader reach to the definition of "claim" and "creditor" than would result from viewing events solely as of the Filing Date. Under that section, the stay applies to actions that "could have been commenced before the commencement of the case" *and* to actions "to recover a claim against the debtor that arose before the commencement of the case." In the context of a products liability claim, the second provision would be redundant if it did not encompass more than just those actions in which the accident occurred prepetition. All prepetition accident claims are covered by the first provision since an action to recover on such an accident could have been commenced prepetition.

■ Section 362(a)(1), like § 101(A)(10), refers to the time that a *claim* arises, not to the time that the injury occurred. The phrase "arose before the commencement of the case" cannot mean, in this context, that the crash had to occur before the Filing Date or the provision would be superfluous. All events which would give rise to the right to commence a *lawsuit* under nonbankruptcy law do *not* have to occur prepetition to fit the bankruptcy law definition of a "claim" that arises prior to the Filing Date. If they did, the definition of claim would be limited to the *Frenville* accrued state law claim concept, specifically rejected in this Court's Future Claims Opinion, the District Court Future Claims Opinion, and by virtually all courts outside of the Third Circuit.[7] Thus, in determining whether § 362(a)(1) bars the prosecution of Calabro's lawsuit, the statutory language "to recover a claim against the debtor that arose before the commencement of the case" may be interpreted by taking into account postpetition events.

---

7. See this Court's Future Claims Opinion, 162 B.R. at 624, and the cases cited therein. *See also,* Mabey and Jarvis, *In re Frenville: A Critique by the National Bankruptcy Conference's Committee on Claims and Distributions,* 42 Bus. Law. 697 (May 1987).

Calabro's claim is virtually identical in nature to claims asserted by parties injured prepetition in crashes of prepetition built planes. The postpetition, preconfirmation crash is considered to determine that Calabro has a "claim". However, since the claim is inextricably tied to the Debtor's prebankruptcy conduct, it makes sense both logically and statutorily to view the claim as one arising before the Filing Date.

### B. Equitable Considerations

#### 1. *Unlike the Future Claimants, Calabro Can and Must Be Treated Under the Plan.*

■ At every stage of this bankruptcy case, Piper has stated its intention to treat Calabro and other similarly situated postpetition preconfirmation accident victims in Piper's plan of reorganization. Piper's complaint in this adversary proceeding seeks a judgment declaring that Calabro's claim, if any, is a claim under § 101(5) subject to administration in this case. Piper has sought similar relief against several other postpetition accident claimants in a separate adversary proceeding filed on April 1, 1994 styled *Piper Aircraft Corporation v. Brambild, et al.*, Adv. No. 94–0293–BKC–RAM–A[8]. Al-. though the Debtor and the Committee urged the Court to find that Calabro held a "claim", at no time prior to the April 8th findings or the April 15th summary judgment order did either the Committee or the Debtor argue that Calabro could not or would not be treated under the Plan if she did not have a § 101(5) claim.

The Court's April 15th order and its April 8th Findings focused solely on the applicability of § 101(5) and § 362(a) to the Calabro claims. The Court did not address the treatment of Calabro's claims under the Plan, but the Court and the Debtor believed that Calabro and all other identifiable parties with claims arising from postpetition, preconfirmation incidents would be treated under and bound by the Plan, whether or not the claims were treated as § 101(5) claims.

The continuation of injunctive relief in the April 8th Findings was premised upon treatment of Calabro under the Plan, regardless of the "claim" determination. Thus, after ruling that Calabro did not hold a § 101(5) claim, the Court nevertheless stated that "A ruling today dissolving the injunction will impact Piper's ability to maintain control over the claims that *it intends to treat under its plan.*" April 8th Findings, p. 23.

It would be unjust to exclude Calabro and others similarly situated from the Plan as a result of a finding that they had no "claims" and had no entitlement to treatment as administrative claimants. Unlike the Future Claimants, Calabro and her counterparts are now identified. Indeed, the Supplemental Bar Date Order entered at the Debtor's request, was done with the specific purpose of facilitating treatment of postpetition claimants in Piper's Plan.[9] In short, Calabro must be treated in the Debtor's plan.

#### 2. *Calabro Must Be a § 101(10) Creditor Holding a § 101(5) Claim to be Treated in and Bound by a Plan of Reorganization.*

■ The term "claim" is a term of art in the Bankruptcy Code defined in § 101(5).

8. This separate adversary seeks declaratory and injunctive relief virtually identical to that sought in this adversary. Named as defendants in this adversary are persons and entities like Calabro, that filed state court lawsuits against the debtor after the Filing Date arising out of postpetition accidents or incidents. Following a hearing on April 19, 1994, the Court entered a preliminary injunction on May 18, 1994 enjoining the defendants from proceeding with their state court lawsuits.

Like the Calabro injunction, the preliminary injunction in this second adversary proceeding was premised upon the Debtor's stated intention to treat each of the defendants in its Plan. Thus, this proceeding filed against and injunction entered against the plaintiffs in eleven other postpe-

tition state court lawsuits provides further evidence of the Debtor's previous commitment to treat postpetition incident claimants in its Plan.

9. As described in Piper's memorandum in support of its motion to vacate and as discussed in the hearing on its motion to establish a supplemental bar date, Piper's intention in seeking a supplemental bar date was twofold. First, Piper wanted to treat all known potential claimants, including postpetition confirmation claimants, in its Plan. Second, Piper believed that its assets would be more valuable in the proposed sale if the buyers were confident that postpetition claimants would be treated and bound by the Plan, rather than amongst those who in the future could assert claims against them.

The Code includes the classification of "claims" pursuant to § 1122, the specification of which classes of "claims" are impaired under § 1123(a)(2) and (3), the treatment of "claims" under § 1123(a)(4), the transmission of the disclosure statement to holders of "claims" under § 1125(c), the right of the holder of a "claim" to accept or reject a plan pursuant to § 1126(a), the acceptance of a plan by a class of "claims" pursuant to § 1126(c) and various requirements for confirmation of a plan which refer to holders of "claims" or classes of "claims" under § 1129. In each instance, the word claim means a claim as that term is defined in § 101(5). Thus, if Calabro and other similarly situated parties do not have § 101(5) claims, there is no statutory basis to classify and treat these parties under a plan of reorganization.[10]

 The *Pettibone* court suggested that a plan could treat a postpetition personal injury victim even if he did not hold a § 101(5) claim and was not entitled to an administrative expense:

> However, provision may also be made under § 1141(d)(1)(A) to deal with the Ramirez claim *in some way* if he prevails on the prepetition negligence theory. If no such provision is made in the Plan or confirmation order, it appears that the Ramirez claim for prepetition negligence and strict liability would be discharged upon confirmation without any treatment or payment. *As to whether such should be permitted* if objected to, this Court may have to determine that issue if presented as part of the confirmation process.

90 B.R. at 934 (emphasis added). *Pettibone* did not discuss how the plan could deal with the claim. Having undertaken the analysis here, this Court reaches a different result than *Pettibone* on the temporal focal point for determining the existence of a claim. To allow for treatment in a plan, a claim triggered by a postpetition accident but linked to the prepetition debtor must be a "claim" as defined in § 101(5).

The term "creditor" is also a term of art in the Code. As defined in § 101(10), "creditor" means

> (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
> (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h), or 502(i) of this title.

 The binding effect of a confirmation order is set forth in § 1141(a) of the Bankruptcy Code which provides in pertinent part that:

> The provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any *creditor*, equity security holder or general partner in the debtor.

§ 1141(a) (emphasis added). Thus, for Calabro to be bound by the Plan, she must be a "creditor" as that term is defined in § 101(10) of the Code.

Concern over binding Calabro to the terms of a plan is not speculative. At oral argument on the Motion to Vacate, the Court asked Mr. Scott, Calabro's counsel, whether Calabro would be bound by Piper's Plan, if Calabro's claim was classified with and treated the same as product liability claims asserted by prepetition crash victims.

> THE COURT: What if you are in that class and vote no, but the class vote is yes ... you would not be bound?
> MR. SCOTT: That's right.
> THE COURT: Ok, so you'd then share and sue the buyer?
> MR. SCOTT: Or whatever other remedies might be available under non-bankruptcy law.

Transcript of June 10, 1994 argument, p. 80.

The notion that Calabro may be treated but not bound is neither logical nor fair. There is no reason, factually or legally, to allow Calabro to participate in a plan and still, as she intends, maintain the right to sue Piper's purchaser or others on her claim.

10. This Court recognizes that in *In re Johns–Manville*, 68 B.R. 618, 628 (Bankr.S.D.N.Y. 1986), the future claimants were treated in the plan even though the Court did not reach the issue of whether they held § 101(5) claims. Significantly, however, the plan was consensual, and the Court did not have to face that issue. *Id.* at 634. Here, the Creditors Committee specifically objects to treatment of Calabro and other postpetition accident victims unless they hold § 101(5) claims and will, like other creditors, be bound by the plan.

This resulting discriminatory treatment in favor of Calabro would be compounded by the potential effect on Piper's prospective purchasers. Predictably, the purchase price will be lower if purchasers are not confident that Calabro and the other postpetition claimants will be bound by the plan and precluded from seeking redress against them. A lower purchase price will adversely affect all creditors. Thus, as demonstrated by the statutory analysis, the compelling facts of this case require Calabro to be a "creditor" holding a "claim" in order to treat her and bind her in a plan.

## III.

### Alternatively, the Court Deems That Calabro Has a Claim That Arose Before the Filing Date

As discussed earlier, there is no language in § 101(5) that limits the "claim" determination to events as of the Filing Date. Moreover, the alternative provisions in § 362(a)(1) together with the generally rejected *Frenville* interpretation of when a claim arises suggest that postpetition events can and should be considered. Nevertheless, the Court recognizes that a narrow interpretation of the relevant Code provisions could lead to the conclusion that the issue presented here is not squarely covered in the Code. It could be argued that the only postpetition incidents that give rise to claims treated as claims arising at or before the filing of a bankruptcy case are those incidents specified in sections 348, 502(f), 502(g), 502(h) and 502(i) all of which are referred to in the definition of creditor in § 101(10)(B).

The Court does not agree that these specific sections are an exclusive list of those circumstances in which postpetition events give rise to claims that are treated as claims arising before the Filing Date. However, even if this narrow view was accepted, the Court would reach the same result by reluctant yet appropriate resort to § 105 of the Code. Pursuant to § 105(a) the Court may issue any order necessary or appropriate to carry out the provisions of Title 11. The equities presented here justify, if necessary, relying on this equitable power of the Court.

Calabro's counsel virtually conceded at oral argument that she has a § 101(5) claim:

"We are not seriously disputing that the Court could find that we have a § 101(5) claim." June 10 Tr., p. 78. Rather, she argues strenuously that her claim cannot be characterized as a claim that arose before the Filing Date. As such, she argues that she is not a "creditor" who can be bound under § 1141(a) to the terms of a plan. She argues further that without a claim that arose before the Filing Date, she is not subject to the automatic stay provisions in § 362(a)(1).

■■■ The provisions of Title 11, in particular, the provisions pertinent to the confirmation of a Chapter 11 plan, are structured to provide equitable treatment to all parties participating in a plan of reorganization. This purpose would be thwarted if Calabro, and others similarly situated, were treated in the Plan but not bound by its terms. Thus, to carry out the applicable reorganization provisions of Title 11, this Court can and does utilize its statutory authority in § 105(a) to treat Calabro as a § 101(10) creditor with a § 101(5) claim arising before the Filing Date.

### RELIEF

In conformity with this opinion, the Court is entering a separate order vacating the Summary Judgment Order in favor of Calabro and entering summary judgment in favor of Piper. Count II of the Complaint seeking injunctive relief under § 105 is now moot and will be dismissed. With all issues in this adversary proceeding now resolved, a final judgment will be entered in favor of Piper granting the declaratory relief requested in Count I of the Complaint. The judgment will find that (1) Calabro's claim, if any, against the Debtor as set forth in the Complaint filed in the New York Action, arose or is deemed to have arisen before the Filing Date; (2) the New York Action is and was, from its inception, subject to the automatic stay provided in § 362(a)(1) of the Code. As such, all orders entered in that action are void; and (3) Calabro's claim, if allowed, will be subject to administration in Piper's Chapter 11 case as follows: (a) to the extent that Calabro establishes liability for postpetition tortious conduct by the debtor-in-possession, Calabro will be entitled to payment of an administrative expense under § 503(b); (b) to the extent that Calabro establishes liabili-

ty attributable to prepetition conduct by the Debtor, her claim, if allowed, is a "claim" as defined in § 101(5) of the Code and Calabro is or is deemed to be a "creditor" as defined in § 101(10) of the Code with respect to any such allowed claim.

### CONCLUSION

The plan of reorganization in this case must treat all those who establish liability arising from postpetition preconfirmation incidents. These parties are presently known or will be known prior to confirmation. They should share in a plan and they should be bound by a plan. In order for this to occur, Calabro and other postpetition incident claimants must be treated as creditors with claims that arose before the filing of Piper's bankruptcy case. This result is both permissible under and consistent with the structure and intent of the Bankruptcy Code. It is also, quite clearly, the right result under the compelling facts of this case.